**Stephen W. KERBY and Deborah A. Kerby, on behalf of themselves and others similarly situated**

v.

**MORTGAGE FUNDING CORPORATION, Major Title Group, Inc., Severn Savings Bank, F.S.B., Countrywide Funding Corp., ABC Corp., a presently unidentified business entity or entities, Mark H. Friedman, Alan J. Hyatt and John Doe, a presently unidentified individual or individuals.**

No. CIV.A. CCB–97–1509.

United States District Court, D. Maryland.

Jan. 8, 1998.

---

5. The factors to be considered by a judicial officer in granting or denying bail, such as the accused's "character, family ties, employment, financial condition, length of residence, community ties" have been described as "best determined by the court in which the person is apprehended if the person happens, as is the case here, to be a resident of the district in which apprehended." *U.S. v. Evans*, 62 F.3d 1233, 1239 (9th Cir.1995) (Noonan, J., dissenting).

6. For example, the prosecutors in the charging district should retain the option of waiting until a defendant arrested in another district first appears before the magistrate judge of the indicting district to move for detention under 18 U.S.C. § 3142(f). *United States v. Dominguez*, 783 F.2d 702, 705 (7th Cir.1986) (holding that the nature and circumstances of the charged offense(s) and the weight of the evidence against the defendant of § 3142(g)(1) and (2) are best assessed in the charging district).

7. But even the judicial officers of the charging district look to the home or arresting district in assessing the defendant's history and characteristics factored into § 3142(g)(3), including "family ties, employment, financial resources, length of residence in the community, community ties, past conduct." *See, Dominguez*, 783 F.2d at 706–07 (the rebuttable presumption of defendant's dangerousness and that no conditions will assure defendant's appearance contained in § 3142(e) were rebutted by evidence of the § 3142(g)(3) factors of social stability and absence of relevant criminal record in the home district where the defendants were arrested).

Jerold J. Oppel, John M.G. Murphy, Kelly A. Cameron, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for Plaintiff.

Michael Schatzow, John A. McCauley, W. Anne Hamel, Venable, Baetjer & Howard, Baltimore, MD, Gerald M. Richman, Ellicott City, MD, for Mortgage Funding & M. Friedman.

Jeffrey Hines, Craig S. Brodsky, Eccelston & Wolf, Washington, DC, for Major Title.

Benjamin Rosenberg, Gerard J. Gaeng, Esq., Timothy Boucher, Rosenberg, Proutt, Funk & Greenberg, Baltimore, MD, for Severn S.B. & Alan Hyatt.

Joseph Kolar, Margo H.K. Tank, Goodwin, Procter & Hoar, Washington, DC, for Countrywide.

### MEMORANDUM

BLAKE, District Judge.

Now pending are the defendants' motions to dismiss various counts of this putative class action arising out of an alleged fraudulent mortgaging refinancing scheme. Plaintiffs, the Kerbys (on behalf of themselves and others similarly situated), allege thirteen counts, which include against all defendants violations of the following federal statutes, upon which this court's jurisdiction is based: the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C.A. §§ 2601—2617 (West 1989 & Supp.1997), the Truth in Lending Act ("TILA"), 15 U.S.C.A. §§ 1601—1667f (West 1982 & Supp.1997), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961—1968 (West 1984 & Supp.1997). The remaining counts consist of pendent state law claims against some or all defendants, including common law fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, intentional interference with contractual relations, civil conspiracy, and violation of the Maryland Consumer Protection Act. Punitive damages under Maryland laws are also sought.

### BACKGROUND

According to their First Amended Complaint, the Kerbys bought and financed their home in 1986, when home mortgage interest rates were relatively high. Rates began to decline in the early 1990s, and refinancing became an attractive option to many homeowners. The various defendants allegedly agreed to violate numerous laws in order to profit from this suddenly hot refinancing market, in which they refinanced mortgages for members of the class of plaintiffs that the Kerbys purport to represent.

The defendants allegedly plotted and executed a successful conspiracy by which defendant Mortgage Funding Corporation ("Mortgage Funding") would be the conduit for highly profitable mortgage loans, from which each defendant would realize a portion of the proceeds. Mortgage Funding obtained its refinancing clientele by promising potential borrowers the "lowest mortgage rate available." (Pl.'s 1st Am. Compl. ¶ 15.) Accordingly, in late summer 1993 the Kerbys received a telephone call from a mortgage broker, believed and relied upon his or her promise to give them the lowest available refinancing rate, and submitted an application which Mortgage Funding approved.

The scheme involved a number of players. Mortgage Funding, having been formed by defendant Mark H. Friedman to capitalize on the hot refinancing market, was never intended to service the loans. Instead, Severn Savings Bank, F.S.B. ("Severn") "was chosen as the nominal 'funder' of the loans." (Pl.'s First. Am. Compl. ¶ 22.) The loan was, however, "pre-sold" to defendant Countrywide Funding Corporation, which assumed the loan fourteen days after closing. The Kerbys discovered Severn's role as lender (but not Countrywide's later assumption of the loan) at the closing on 14 September 1993, when Severn gave them the RESPA-required Good Faith Estimate of Settlement Costs containing Severn's name and address at the top of the document. (*Id.* Ex. A.) Defendant Major Title Group, Inc. ("Major Title"), another entity formed and controlled by Mr. Friedman, was the settlement agent. In addition to itemizing the closing costs totaling $5,785.25, payable to Severn, the Good Faith Estimate stated:

> These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA).... The estimates are based on the charges generally made by The Major Title Group, [address]. This loan originated with Mortgage Funding Corporation (MFC). Mortgage Funding assigns a substantial amount of its applications to Severn Savings Bank, who then becomes the "Lender" to you, the Borrower. Mortgage Funding has common ownership with The Major Title Group.

> You may select your own attorney or title company to perform the settlement of your loan. No matter who you choose as settlement agent, the agent must be approved by the Bank and settlement must take place in accordance with the forms and procedures as the Bank deems necessary. *If you do select a settlement agent other

than The Major Title Group, The Major Title Group will review forms on behalf of the Bank and will still charge you a review fee in the amount of approximately $250.00.

The Good Faith Estimate should have been given to the Kerbys within three calendar days of receipt of their application. *See* 24 C.F.R. § 3500.7(b). The reason for the delay, according to the Kerbys, was that the Good Faith Estimate was intentionally misleading in that it concealed certain illegal kickbacks; by not providing it until closing, the defendants ensured "that the document would be essentially lost in the avalanche of documents typically involved in a real estate settlement, and would lessen the chance that the borrower would discover and challenge the inaccuracies." (*Id.* ¶ 18.) This strategy apparently worked, as the Kerbys only discovered the alleged misrepresentations more than three years after closing.

According to an internal Severn document entitled "Funding Detail," (*id.* Ex. C.), the Kerby refinancing resulted in the following payments to the defendants from a $116,350 loan. Severn received $540.88 for holding the "pre-sold" loan for 14 days. Mortgage Funding received from Severn $5,304.39 for its brokering efforts. $2,296.25 of this amount was disclosed to the Kerbys on the HUD–1 Settlement Statement (which is a federally-required statement of actual closing costs, as compared with the statement of estimated closing costs in the Good Faith Estimate) as closing costs payable to Severn. (*Id.* Ex. B.) The balance came from Countrywide, the ultimate lender, in the form of an alleged illegal kickback, sometimes called a "yield spread premium," which is basically a commission paid to a mortgage broker for generating an above-par interest rate loan. Countrywide paid Severn this amount, which Severn paid to Mortgage Funding. The Kerbys reason that, "if the ultimate funder were willing to pay this substantial amount to obtain the loan instruments, one might conclude that the rate was too high, and further negotiation might well secure a lower rate. In fact, this is precisely the theory behind the disclosure requirements of federal law." (*Id.* ¶ 29.)

## ANALYSIS

### 1. *Jurisdiction Over the RESPA and TILA Claims*

Count 1 alleges that the yield spread premium paid by Countrywide and received by Severn is a prohibited "kickback" under RESPA,. 12 U.S.C.A. § 2607(a). Count 3, also brought under RESPA, alleges that Mortgage Funding, Severn, ABC and Doe split this kickback between them in violation of 12 U.S.C.A. § 2607(b). Count 2 alleges that the defendants violated various provisions of TILA and the regulations thereunder by failing to disclose the yield spread premiums.

The defendants claim that these counts are barred because the statute of limitations has run. The Kerbys agree that the time limits under the two statutes have passed, but claim that fraudulent concealment on the part of the defendants equitably tolled the statute of limitations until they reasonably could discover the violations. The defendants argue in reply that the time limitations contained in RESPA and TILA are jurisdictional rather than procedural, and, thus, the Kerbys are foreclosed even from arguing that the defendants' conduct tolled the statute. Accordingly, the issue presented on this motion is the narrow one of whether the principle of equitable tolling can ever apply to the limitations periods in RESPA and TILA—an issue over which courts are in disagreement.

The two provisions are similar, and will be analyzed together. RESPA provides in relevant part:

**§ 2614 Jurisdiction of courts; limitations**

Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, . . . within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation . . . .

12 U.S.C.A. § 2614. TILA provides in relevant part:

**Jurisdiction of courts; limitations on actions**

(e) Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law.

15 U.S.C.A. § 1640(e).

▮ "The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one 'of legislative intent whether the right shall be enforceable ... after the prescribed time....' Classification of such a provision as 'substantive' rather than 'procedural' does not determine whether or under what circumstances the limitation period may be extended.... [T]he basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Burnett v. New York Cent. R.R. Co.,* 380 U.S. 424, 426–27, 85 S.Ct. 1050, 1053–54, 13 L.Ed.2d 941 (1965) (citations omitted) (first alteration in original). Neither TILA nor RESPA states whether equitable tolling applies to their respective statutes of limitations, and legislative history is likewise silent. *See Hardin v. City Title & Escrow Co.,* 797 F.2d 1037, 1039 & n. 3 (D.C.Cir.1986) (RESPA); *Davis v. Edgemere Finance Co.,* 523 F.Supp. 1121, 1125 (D.Md. 1981) (TILA).

In the face of such congressional silence, two approaches to this problem have developed, with polar results. In essence they begin from different baseline assumptions: one, that the doctrine of equitable tolling is " ' read into every federal statute of limitation,' " *Davis,* 523 F.Supp. at 1125 (quoting *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (Frankfurter, J.)); the other, that "[j]urisdictional provisions in federal statutes are to be strictly construed." *Hardin,* 797 F.2d at 1040

(holding RESPA not subject to equitable tolling, and reasoning in dicta that TILA is not subject to equitable tolling).

▮ The cases holding that the statute of limitations is subject to equitable tolling, in the opinion of this court, have better followed a substantial line of Supreme Court precedent in attempting to discern congressional intent from "the purposes and policies underlying the limitations provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." *Burnett,* 380 U.S. at 427, 85 S.Ct. at 1054. The purposes of each Act are codified in the text of the statutes themselves. RESPA provides in relevant part:

**§ 2601. Congressional findings and purpose**

(a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with *greater and more timely information* on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country....

(b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result—

(1) in more effective advance *disclosure* to home buyers and sellers of settlement costs;

(2) in the *elimination of kickbacks or referral fees* that tend to increase unnecessarily the costs of certain settlement services ....

12 U.S.C.A. § 2601 (emphasis supplied). Similarly, TILA provides in relevant part:

**§ 1601. Congressional findings and declaration of purpose**

**(a) Informed use of credit**

The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the *informed* use of

credit. The *informed* use of credit results from an *awareness* of the cost thereof by consumers. It is the purpose of this subchapter to assure a *meaningful disclosure* of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C.A. § 1601 (emphasis supplied). Disclosure is the theme most consistently espoused in these congressional declarations of purpose; indeed, one act is entitled *"Truth in Lending."* The court must now determine whether allowing the statute to expire where a plaintiff's cause of action is fraudulently concealed by the defendant is inconsistent with this evidence of congressional intent. Manifestly, it is. In *Davis,* Judge Kaufman of this District held TILA subject to equitable tolling, reasoning in essence that it would be incongruous to interpret congressional silence in the context of this remedial statute directed at fraud as expressing an implied intention to allow fraudulent conduct to conceal a plaintiff's cause of action until the statute of limitations had run. 523 F.Supp. at 1125. Another court has explained:

> As a general rule, the doctrine of equitable tolling is read into every federal statute of limitations. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). The Second Circuit has declared that this "policy is so strong that it is applicable unless Congress expressly provides to the contrary in clear and unambiguous language." *Atlantic City Electric Co. v. General Electric Co.,* 312 F.2d 236, 241 (2d Cir.1962). As evidenced by the Sixth Circuit's interpretation of TILA's similarly-worded provision, the time limitation in RESPA does not reflect a clear and unambiguous intention that the policy of *Holmberg* be disregarded. Had Congress intended that equitable tolling not apply to RESPA, it certainly could have said so explicitly.

> In addition, the Second Circuit has held that if "a statute is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *N.C. Freed Co., Inc. v. Bd. of Governors of Fed. Res. Sys.,* 473 F.2d 1210, 1214 (2d Cir.1973). This Court is especially concerned that RESPA's purposes will be frustrated if its time limitation provision is read to be a rigid jurisdictional prerequisite, and not as an ordinary statute of limitations. The jurisdictional grant of power by Congress to the federal courts under RESPA is severely undermined if a culpable party need only cover up fraud for one year to avoid the reach of the statute.

*Moll v. U.S. Life Ins. Co.,* 700 F.Supp. 1284, 1288 (S.D.N.Y.1988) (parallel citations and emphasis omitted); *accord King v. California,* 784 F.2d 910, 915 (9th Cir.1986) (finding that an inflexible interpretation of the limitations period in TILA is inconsistent with legislative intent); *Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1041 (6th Cir.1984) ("[a]ppellee is mistaken to suggest that Congress' jurisdictional grant of power to the federal courts is so fragile as to be defeated by the intentionally fraudulent designs of those who unscrupulously would seek to avoid rightful claims to protection by the exercise of that power"); *Chevalier v. Baird Sav. Ass'n,* 371 F.Supp. 1282, 1284 (E.D.Pa. 1974) (recognizing that TILA is subject to equitable tolling); *Matter of Dickson,* 432 F.Supp. 752, 756 (W.D.N.C.1977) (same).

Surely RESPA and TILA were directed at the best as well as the worst of swindlers. "To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874) (applying equitable tolling to Bankruptcy Act of 1874). As Justice Black once opined, "[t]o decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle ... has frequently been employed to bar inequitable reliance on statutes of limitations." *Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 232–33, 79

S.Ct. 760, 761–62, 3 L.Ed.2d 770 (1959). In holding equitable estoppel applicable to the statute of limitations in the Federal Employers' Liability Act, the Court in *Glus* explained that "[w]e have been shown nothing in the language or history of the ... Act to indicate that this principle of law, older than the country itself, was not to apply in suits arising under that statute." *Id.* at 234, 79 S.Ct. at 763.

The opposite approach is illustrated by the D.C. Circuit case of *Hardin,* which several courts have followed. First, the court framed the issue as whether the limitations period was jurisdictional or procedural. *Hardin,* 797 F.2d at 1039. It next reasoned that, because RESPA's time limitation (1) is contained in the same sentence that creates federal and state court jurisdiction, and (2) is contained in the same section of the bill which Congress voted on entitled "JURISDICTION OF COURTS," Congress must have meant for the limitation to be "jurisdictional." Moreover, nothing in the legislative history contradicted this. Curiously, the court did not examine the congressional purpose expressly contained in the statute itself. *See* 12 U.S.C.A. § 2601 (set out above). And the Supreme Court would seem to disagree as a general matter that such sentence-structure analysis should receive substantial weight. "[T]he fact that the right and limitation are written into the same statute does not indicate a legislative intent as to whether or when the statute of limitations should be tolled. Thus the 'substantive'—'procedural' distinction would seem to be of little help in deciding questions of extending the limitation period." *Burnett,* 380 U.S. at 427 n. 2, 85 S.Ct. at 1054 n. 2. "The proper test is not whether a time limitation is 'substantive' or 'procedural,' but whether tolling the limitation in a given context is consonant with the legislative scheme." *American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 557, 94 S.Ct. 756, 768, 38 L.Ed.2d 713 (1974) (citing *Burnett,* 380 U.S. at 427, 85 S.Ct. at 1054).

At this point in its analysis, the court made a subtle yet extremely powerful move—a move that was, however, unwarranted. For only *after* labeling the time limitation "jurisdictional" did the court turn to the question of whether equitable tolling applied. This made its conclusion that tolling was barred quite easy to reach, as it could then apply the statutory canon that "[j]urisdictional provisions in federal statutes are to be strictly construed." *Id.* at 1040. But, having previously framed the issue as whether the time limitation was "jurisdictional" or "procedural," it essentially assumed what it sought to prove. Moreover, in support of its application of the strict construction canon to this "jurisdictional" statute, the court cited to six inapposite Supreme Court cases—every one of which concerned the United States' waiver of sovereign immunity—a quite different issue than the one presented here by a private action brought under RESPA and TILA. *See United States v. Tillamooks,* 329 U.S. 40, 45, 67 S.Ct. 167, 169–70, 91 L.Ed. 29 (1946); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 178–79, 78 S.Ct. 1097, 1109–10, 2 L.Ed.2d 1228 (1958) (Frankfurter, J., dissenting) [1]; *Blackfeather v. United States,* 190 U.S. 368, 376, 23 S.Ct. 772, 775, 47 L.Ed. 1099 (1903); *United States v. Cumming,* 130 U.S. 452, 455, 9 S.Ct. 583, 584, 32 L.Ed. 1029 (1889); *United States v. Wardwell,* 172 U.S. 48, 52, 19 S.Ct. 86, 88, 43 L.Ed. 360 (1898); *Finn v. United States,* 123 U.S. 227, 229, 8 S.Ct. 82, 83–84, 31 L.Ed. 128 (1887). In the only case among these that the court undertook to analyze, *Finn,* it explained that there the Supreme Court found a limitations period to be jurisdictional in nature. True enough, but in that case the issue was the United States' waiver of the statute of limitations by failure to plead it as an affirmative defense. The statute at hand provided " '[t]hat every claim against the United States ... shall be forever barred' " unless filed within six years after it accrued. *Finn,* 123 U.S. at 227, 8 S.Ct. at 83–84 (citation omitted). The Supreme Court first noted the "general rule that limitation does not operate by its own force as a bar, but is a defense ...." *Id.* at 231, 8 S.Ct. at 85. It then noted that the government's waiver of sovereign immunity was to be strictly construed, explaining that, while "[a]n individual may waive such a de-

---

1. Note that it was Justice Frankfurter in *Holmberg* who stated that equitable tolling "is read into every federal statute of limitation." 327 U.S. at 397, 66 S.Ct. at 585.

fense, ... the government has not expressly or by implication conferred authority upon any of its officers to waive the limitation imposed by the statute upon suits against the United States in the court of claims." *Id.* None of these cases, therefore, lends support to the holding in *Hardin,* and *Finn* expressly contradicts that holding by affirming the general rule that, where the defendant is not a sovereign, statutes of limitations may be waived by a defendant. The starting point of the Court's analysis in these cases—that the government cannot be sued unless it has consented, together with the concomitant principle that waivers of sovereign immunity must be strictly construed—is simply inapposite to interpretation of the limitations periods under RESPA and TILA. *Cf.* 51 Am. Jur.2d Limitations of Actions § 50 at 630 (1970 Supp. April 1997) ("except in the case of statutes of limitation against the government, the courts are inclined to construe limitation laws liberally, so as to effect the intention of the legislature." (footnotes omitted)). The Supreme Court continues to reaffirm the difference between the government's waiver of sovereign immunity, which is to be strictly construed, and equitable tolling of statutes of limitations in suits between private litigants, which, at least in the absence of a contrary congressional intent, is not. *Compare United States v. Dalm,* 494 U.S. 596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990) ("Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' A statute of limitations requiring that a suit against the Government be brought within a certain time period is one of those terms." (citations omitted) (alteration in original)); *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 2701–02, 69 L.Ed.2d 548 (1981) ("Like a waiver of sovereign immunity itself, which must be 'unequivocally expressed,' 'this court has long decided that limitations and conditions upon which the government consents to be sued must be strictly observed and exceptions thereto are not to be implied.' " (citations omitted)); and *United States v. Nordic Village, Inc.,* 503 U.S. 30,

33–34, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992) ("Waivers of the Government's sovereign immunity ... must be 'unequivocally expressed.' ... [M]oreover, they are not generally to be 'liberally construed.' " (citations omitted)) *with Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) ("Time requirements in lawsuits between private litigants are customarily subject to 'equitable tolling.' " (citation omitted)); *Hallstrom v. Tillamook County,* 493 U.S. 20, 27, 110 S.Ct. 304, 309, 107 L.Ed.2d 237 (1989) ("The running of such statutes is traditionally subject to equitable tolling. *See, e.g., Honda v. Clark,* 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967) (holding that where consistent with the overall congressional purpose, a 'traditional equitable tolling principle' should be applied to a statutory limitations period)."); *Lampf, Pleva, Lipkind, et al. v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) (describing equitable tolling as a "venerable principle").

To buttress its RESPA holding, the court in *Hardin* also, by comparison, reasoned in dicta that TILA was not subject to equitable tolling, citing for support to *Rust v. Quality Car Corral, Inc.,* 614 F.2d 1118, 1119 (6th Cir.1980). *Rust* has since been overruled in an en banc opinion by Judge Boyce Martin, who also authored *Rust, see Bartlik v. U.S. Dep't of Labor,* 62 F.3d 163, 166 & n. 1 (6th Cir.1995) (en banc) ("The distinction found in our case law between a 'jurisdictional' statute of limitations, e.g., *Rust,* ... and a 'procedural' one, ... is no longer meaningful for purposes of calculating the beginning and end of a limitations period ...."). But in any event, *Rust* never stood for the proposition for which it was cited in *Hardin,* as it concerned instead the narrow question whether Fed.R.Civ.P. 6(a) should be read into the TILA statute of limitations to exclude the actual date of the violation from computation of the one year limitations period. *See Jones,* 747 F.2d at 1042 (distinguishing *Rust,* holding that use of the word "jurisdiction" in *Rust* addressed "only the jurisdiction to hear claims under TILA in the absence of allegations of fraudulent concealment meriting application of equitable tolling"); *Moll,* 700 F.Supp. at 1287 ("*Rust* did not establish that

the TILA time limitation was exempt from tolling.").

The court in *Hardin* also gleaned congressional intent from a 1980 amendment to TILA, reasoning as follows:

> Congress has implicitly recognized that § 1640(e) of the Truth in Lending Act is jurisdictional. As originally enacted, § 1640(e) provided:
>
>> Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.
>
> Pub.L. No. 90–321, Title I, § 130(e), 82 Stat. 146, 157 (1968). In 1980, this provision was amended to provide further that:
>
>> This subsection does not bar a person from asserting a violation of this title in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law.
>
> Pub.L. No. 96–221, Title VI, § 615(d), 94 Stat. 132, 181 (1980). We can infer from this amendment that Congress recognized that the time limitation of § 1640(e) was jurisdictional. Were this time limitation an ordinary statute of limitations, it would have been unnecessary for Congress to amend the statute to specify that the defense of recoupment would survive the running of the time limitation.
>
>> [R]ecoupment, being in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded, is *never* barred by the statute of limitations. . . . Stated in another way, the defense of recoupment may be asserted even though the claim as an independent cause of action is barred by limitations.
>
> 51 Am.Jur.2d *Limitation of Actions* § 77 (1970) (emphasis added). Thus, by its 1980 amendment of § 1640(e), Congress gave the then existing statute the same jurisdictional interpretation as the Sixth Circuit did in *Rust.*

*Hardin,* 797 F.2d at 1039–40 n. 4. The major premise of the court's reasoning, however, is based on a mistaken assumption. The court's statement, "[w]ere this time limitation an ordinary statute of limitations, it would have been unnecessary for Congress to amend the statute to specify that the defense of recoupment would survive the running of the time limitation," is supported by a citation to American Jurisprudence. But the pre-amendment case law under TILA itself did not follow the general principle that recoupment is always allowed, as the D.C. Circuit apparently assumed; rather, courts were in sharp conflict over whether recoupment or set-off could be asserted as a defense when affirmative relief based upon the same statutory right would have been time-barred. For example, a Florida state court reviewing the landscape had this to say in 1979, including a reference to the then-pending 1980 amendment:

> Many courts throughout the country have considered this question and numerous well-reasoned decisions have reached conflicting conclusions. The following cases conclude that a debtor may assert common law recoupment based on the Federal Truth In Lending Act despite the running of the one-year statute of limitations. *Wood Acceptance Co. v. King,* 18 Ill.App.3d 149, 309 N.E.2d 403 (Ill.App. 1st Dist.1974); *Continental Acceptance Corp. v. Rivera,* 50 Ohio App.2d 338, 363 N.E.2d 772 (1976); *Household Finance Corp. v. Hobbs,* 387 A.2d 198 (Super.Ct.Del.1978); *Public Loan Company, Inc. v. Hyde,* 63 A.D.2d 193, 406 N.Y.S.2d 907 (3d Dept. 1978); *Stephens v. Household Finance Corp.,* 566 P.2d 1163 (Okl.1977). The foregoing is not a complete compilation of authorities but is representative.
>
> The following cases reach a contrary conclusion. This list is also representative only. *Gillis v. Fisher Hardware,* 289 So.2d 451 (Fla. 1st DCA 1974); *Shannon v. Carter,* 282 Or. 449, 579 P.2d 1288 (1978); *Ken–Lu Enterprises, Inc. v. Neal,* 29 N.C.App. 78, 223 S.E.2d 831 (1976); *Hodges v. Community Loan and Investment Corp. of North Georgia,* 133 Ga.App. 336, 210 S.E.2d 826 (Ga.App.Div.1); *aff'd, as mod.,* 234 Ga. 427, 216 S.E.2d 274

(1975); *Beneficial Finance Co. of Atlantic City v. Swaggerty,* 159 N.J.Super. 507, 388 A.2d 647 (1978); *Lincoln First Bank of Rochester v. Sielawa,* 91 Misc.2d 778, 398 N.Y.S.2d 654 (1977).

... Whether the statutory right to recover twice the finance charges under the Federal Truth In Lending Act may be asserted beyond the one-year statutory limitation is, in our opinion, a legislative decision for Congress. The statute as written provides a one-year limitation which we find clear and properly enforceable to bar the recoupment defense here asserted.

Congress well knew that most debtors would become aware of creditor violations in the Truth In Lending Act only when the debtor contacts a lawyer to defend a suit on the debt brought by the creditor. The policy decision of whether the penalty of twice the finance charge is an affirmative cause of action or a defense is one best left to the Legislature rather than the courts. Congress presumably enacted the one-year limitation for some reason and they were aware of the realities of consumer credit transactions as indicated above. See *Shannon v. Carter, supra.* We are advised by counsel for petitioners that an amendment to the Truth In Lending Act is pending in Congress which would specifically answer the question posed in these cases. We are convinced that the remedy of the petitioners/debtors herein is by a change in the statute.

*Devlin v. Aetna Fin. Co.,* 379 So.2d 972, 973–74 (Fla.Dist.Ct.App.1979).

It thus appears that congressional intent may more accurately be gleaned from the actual context of the amendment than from a treatise explaining a general principle of law not uniformly followed by judicial interpretations of TILA. Congress seems to have reacted to the problem presented by numerous conflicting decisions on recoupment by clarifying that equitable principles apply to TILA, rather than, as *Hardin* concluded,

implicitly recognizing that the limitations period is jurisdictional. Thus, to the extent that Congress' act of amending TILA is relevant to interpretation of the original act, *see Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S.Ct. 1127, 1133, 71 L.Ed.2d 234 (1982) ("subsequent legislative history is not dispositive"); *Cannon v. Univ. of Chicago,* 441 U.S. 677, 686 n. 7, 99 S.Ct. 1946, 1953 n. 7, 60 L.Ed.2d 560 (1979) ("we cannot accord these remarks [made in the context of a later amendment] the weight of contemporary legislative history"), it seems more likely that Congress viewed TILA's limitations period as subject to equitable principles in a proper case. Had the state of the case law on recoupment come to the attention of the *Hardin* court, it may have reached a different conclusion in its discussion in dicta of the TILA limitations period. It manifestly cannot be said, however, that under the circumstances "it would have been unnecessary for Congress to amend the statute" to clearly establish the permissiveness of a recoupment defense. *Hardin,* 797 at 1039–40 n. 4.

█ In sum, I must respectfully disagree with the opinion in *Hardin* for several reasons: its citation to inapposite case law addressing sovereign immunity, which actually tends to support rather than undermine the case for equitable tolling under RESPA and TILA; its extraction of congressional intent by examining which part of which sentence the time limitations are contained while ignoring express congressional purpose in the plain text of the Acts; *its apparent assumption that courts prior to the 1980 TILA amendment uniformly followed the supposed general rule on recoupment when in fact they were split;* its disregarding of well-settled federal principles of equitable tolling as elucidated repeatedly by the Supreme Court; and its application of a "jurisdictional" statutory canon both before and in the service of determining whether the limitations periods are in fact, as it framed the issue, "jurisdictional." Accordingly, I hold that the limitations periods in RESPA and TILA are subject to the doctrine of equitable tolling.[2]

**2.** The defendants argue that the court is bound by, or at least should follow, an unpublished Fourth Circuit opinion following *Hardin. See Zaremski v. Keystone Title Assoc., Inc.,* No. 88–

2569, 1989 WL 100656, at \*1 (4th Cir. Aug.30, 1989). This contention is incorrect. Local Rule 36(c) provides that citation to unpublished opinions "in the district courts within this Circuit is

What this holding does is give the Kerbys a chance to prove that the requirements for equitable tolling are met, which in this Circuit include fraudulent concealment on the part of the defendants and due diligence by the Kerbys to discover the existence of their cause of action. *See Davis,* 523 F.Supp. at 1125–28; *cf. Klehr v. A.O. Smith Corp.,* ––– U.S. –––, –––, 117 S.Ct. 1984, 1993, 138 L.Ed.2d 373 (1997) (holding that, in context of civil RICO action, "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment' "). As these issues have not been briefed, the court does not address them at this time; however, I note that setting aside a statute of limitations is no easy task, and no court that has held RESPA or TILA subject to equitable tolling appears yet to have proceeded to hold, on its facts, that the statute had been tolled.

### 2. *RICO*

█ The Kerbys allege in Count 10 that the defendants' mortgage scheme violates 18 U.S.C.A. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985). Racketeering activity is defined by RICO as any act "chargeable" under several generically described criminal laws, and any act "indictable" under numerous federal criminal provisions, including mail and wire fraud. 18 U.S.C.A. § 1961(1)(A–B). These offenses are commonly referred to as RICO "predicate acts." The Kerbys allege that the predicate acts committed by the defendants are proscribed by the mail and wire fraud statutes, 18 U.S.C.A. §§ 1341, 1343, listed in § 1961(1)(B).[3]

█ "The elements of mail fraud are (1) a scheme disclosing an intent to defraud, and (2) the use of the mails in furtherance of the scheme." *Chisolm v. TranSouth Financial Corp.,* 95 F.3d 331, 336 (4th Cir.1996) (explaining the elements of mail fraud under 18 U.S.C.A. § 1341). Wire fraud is similar, except that "wire, radio, or television," rather than the mails, provides the means to further the fraud. 18 U.S.C.A. § 1343. In the context of a RICO action, the mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but must merely be in furtherance of the fraudulent, material misrepresentation upon which the

---

disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case." None of the exceptions stated in the rule applies. Moreover, the court in *Zaremski,* which issued a two-and-a-half page opinion dealing with issues of RESPA, antitrust, fraud, and Rule 11 sanctions, contained no analysis of RESPA but merely stated, after briefly summarizing *Hardin,* that "[w]e are not persuaded to disagree with the D.C. Circuit's reasoning in *Hardin* ...." *Id.* This does not suggest the kind of analysis the Fourth Circuit would have applied had it intended to bind the lower courts. *Cf. Hogan v. Carter,* 85 F.3d 1113, 1118 (4th Cir.1996) (en banc) ("Under our own internal rules, unpublished opinions are not precedential; indeed, '[i]n the absence of unusual circumstances,' we are bound as a court 'not [to] cite an unpublished disposition in any of [our] published opinions or unpublished dispositions.' Local Rule 36(c).").

**3.** In the section of their First Amended Complaint alleging violation of RICO, the Kerbys also allege criminal violations of RESPA, 12 U.S.C.A.

§ 2607 (prohibiting certain kickbacks), and financial institution bribery, 18 U.S.C.A. § 215(a). While these may be indictable offenses, they are not included in the list of RICO § 1961(1) offenses constituting racketeering activities, and therefore cannot constitute the predicate acts upon which a RICO count is based. The Kerbys do allege violations of 18 U.S.C.A. § 1952, a predicate offense listed in § 1961(1)(B), which proscribes traveling in and using the facilities of interstate commerce to distribute the proceeds of "unlawful activities." The definition of "unlawful activities" as used in 18 U.S.C.A. § 1952 does not include RESPA violations, but does include "bribery." But since the Kerbys have made nothing more than a bare allegation with no explanation of how or by whom a violation of 18 U.S.C. § 215(a) supposedly occurred, the court will not consider this as a predicate RICO offense.

plaintiff justifiably relies to his or her detriment. As the Fourth Circuit recently explained, with a somewhat gruesome metaphor,

> a civil RICO suit may be maintained, not only in mail fraud cases where the deceitful mailing is the blade rushing down toward the guillotine victim, but also in cases involving more grandiose schemes to cheat, where the mailing is but part of the frame that holds the blade. . . . The only caveat is that, where fraud is alleged as a proximate cause of the injury, the fraud must be a "classic" one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation.

*Id.* at 337; *see also In re American Honda Motor Co. Dealerships Litigation,* 941 F.Supp. 528, 546 n. 19 (1996) (stating that "a mailing need only be a necessary step in furtherance of a scheme, and need not be fraudulent in and of itself").

■ The Kerbys allege a number of mailings, and the defendants claim that these allegations fail for lack of the specificity required by Fed.R.Civ.P. 9(b), which provides that in "all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." RICO claims predicated on mail fraud must comply with Rule 9(b). *Windsor Assoc., Inc. v. Greenfeld,* 564 F.Supp. 273, 279–80 (D.Md. 1983) (applying Rule 9(b) to RICO claim predicated on mail fraud); David B. Smith, Terrance G. Reed, *Civil Rico,* ¶ 7.02[1] at 7–3 (through release No. 17, March 1997) ("Without exception, the many courts that have considered the question have all concluded that Rule 9(b)'s special pleading requirement applies to civil RICO claims involving allegations of fraud."). Balanced against this particularity requirement, however, is the notice pleading requirement of Fed.R.Civ.P. 8(a), which requires "a short and plain statement of the claim showing the pleader is entitled to relief." Courts have often struggled to discern the proper balance between these two rules in the RICO-mail fraud context.

*See id.* § 7.02[2] at 7–3—7–11 (discussing cases).

The Rule 9(b) particularity problem is exacerbated when multiple defendants are involved. A complaint that generally alleges a fraudulent scheme without clearly specifying which defendant played which role fails to comport with the rule. *See Wang Laboratories, Inc. v. Burts,* 612 F.Supp. 441, 445 (D.Md.1984) (dismissing some defendants in RICO suit predicated on mail fraud where plaintiff "group[ed] all twelve defendants together under the heading of 'defendants' in three conclusory paragraphs"). Judge Ramsey, in *Mylan Laboratories, Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1074–75 (D.Md.1991), cogently explained the interplay between Rules 8(a) and 9(b).

Rule 9(b) applies to claims arising under RICO, and a RICO claim alleging fraud as its underlying predicate act must do so with particularity or else be dismissed. *See Wang Laboratories, Inc. v. Burts,* 612 F.Supp. 441 (D.Md.1984). The requirement of "particularity" does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists. *Copiers Typewriters Calculators v. Toshiba Corp.,* 576 F.Supp. 312, 327 (D.Md.1983). Specifically, detail is necessary when pleading the "circumstances" of the fraud. "The rule requires the presentation of the situation out of which the claim arose." *Oliver v. Bostetter,* 426 F.Supp. 1082, 1089 (D.Md.1977).

> " 'Circumstances' refers to such matters as 'the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation, and what [was] obtained thereby' ".

*Windsor Assoc. Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (1983) citing [Charles A.] Wright and [Arthur R.] Miller, *Federal Practice and Procedure,* § 1297, at 590 (1990) (and cases cited therein). [Plaintiff] should allege defendants' individual participation in the alleged fraud as well as the relationship of the individual defendants to the purported scheme. *Wang Laboratories,* 612 F.Supp. at 445.

The particularity requirement of Rule 9(b) does not render the general principles announced in Rule 8 entirely inapplicable in pleadings alleging fraud: both rules must be read in conjunction with each other. *Oliver v. Bostetter*, 426 F.Supp. 1082, 1089 (D.Md.1977); 5 [Charles A.] Wright and [Arthur R.] Miller, *Federal Practice and Procedure: Civil 2d.* § 1298 at 617 (1990). In balancing the policies of rules 8 and 9(b),

> "The most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading."

*Windsor Assoc. Inc.*, 564 F.Supp. at 280; *Nunes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 609 F.Supp. 1055, 1065 (D.Md. 1985); [Charles A.] Wright and [Arthur R.] Miller, *Federal Practice and Procedure*, § 1298 at 648 (1990). Nonetheless, a pleading sufficient under Rule 8 may not be sufficient under Rule 9(b) which "requires more than mere notice in cases of fraud." *Oliver*, 426 F.Supp. at 1089. In addition to the policy of notice, Rule 9(b) also serves to protect from harm a defendant's reputation and goodwill, and to reduce the number of strike suits. *Gollomp v. MNC Financial, Inc.*, 756 F.Supp. 228, 232 (D.Md. 1991).

■ The Kerbys have adequately alleged the "circumstances" surrounding the false representation, by an agent of Mortgage Funding, that Mortgage Funding would provide the lowest available mortgage rate. The representation was made by telephone in late summer 1993, and Mortgage Funding received a benefit of over $5,000, some $2,500 more than the actual closing costs disclosed to the Kerbys. Mr. Friedman (and the unknown John Doe defendant or defendants) is alleged to have formed Mortgage Funding for the purpose of perpetrating the fraud. (Pl.'s 1st Am. Compl. ¶ 20.) The court thus holds that the RICO claim is sufficiently alleged as to Mortgage Funding and Mr. Friedman.

■ Similarly, the Kerbys have alleged with requisite particularity Major Title's role in the scheme. Created and substantially controlled by Mr. Friedman, as was Mortgage Funding, Major Title acted as settlement agent and helped to conceal the kickbacks or yield spread premiums from Countrywide to Severn to Mortgage Funding. It was allegedly able to fulfill this role because of the requirement that the Kerbys use Major Title or pay $250 for its review of the settlement papers. Given Mr. Friedman's control, Major Title's selection as settlement agent seems reasonably to suggest its involvement in concealing the fraud.

■ Severn presents a closer case than Mortgage Funding, Mr. Friedman and Major Title, but the Kerbys have adequately pleaded its role in the fraud. First, Severn cites to *Davis v. Hudgins* for the proposition that "[c]onclusory allegations that disparate parties were associated in fact are insufficient to sustain a RICO claim, absent allegations as to how the members were associated ...." 896 F.Supp. 561, 568 (E.D.Va.1995) (citations omitted), *aff'd* 87 F.3d 1308 (4th Cir.1996) (unpublished disposition), *cert. denied* —— U.S. ——, 117 S.Ct. 1440, 137 L.Ed.2d 546 (1997). (Severn Mem. Supp. Mot. To Dismiss at 19.) But the Kerbys have alleged how Severn was involved, and have produced the previously described internal Severn "Funding Detail" showing the payments from Countrywide to Severn to Mortgage Funding. (Pl.'s. 1st Am.Compl.Ex. C.) This is far from a conclusory allegation of association; it shows money actually changing hands in an undisclosed transaction, the cost of which was to be unknowingly paid by the borrower over time in the form of a higher interest rate. The Kerbys also have alleged that Severn violated RESPA in the transaction by failing to provide the Good Faith Estimate within three days of taking the Kerbys' application. Severn contests neither the legal standard nor the factual accuracy of this allegation. Under these circumstances, on a motion to dismiss the court must accept the allegation as true. In sum, based on the allegations concerning Severn's role in transmitting the yield spread premium from Countrywide to Mortgage Funding, its $540.88 compensation essentially for holding risk-free a "pre-sold" loan for two weeks, and

its failure to provide the routine Good Faith Estimate when required, the Kerbys have sufficiently alleged the requisite "circumstances" under Rule 9(b) regarding Severn's participation in the fraud. *Compare Windsor Assoc.,* 564 F.Supp. at 280 (complaint detailing each defendant's role in and benefit received from kickback scheme sufficiently "apprise[d] defendants of the scheme they allegedly devised to defraud plaintiffs, the acts allegedly undertaken pursuant to that scheme, and what was obtained thereby") *with Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 777 (7th Cir.1994) (allegations that the misrepresentations were made " 'at the direction, under the supervision, or with the knowledge and consent' of all the defendants" failed to satisfy Rule 9(b)).

■ Severn also complains that it is not differentiated at all in the generalized descriptions of the acts of mail and wire fraud. Although this is true, and gives the court some pause, in this context it is not fatal to the Kerbys' complaint. First, just as the plaintiffs do not have to rely on the mail and wire communications themselves, but only on the misrepresentation that is furthered by those communications, *Chisolm,* 95 F.3d at 337, the mails and wires do not have to be used by each defendant, but merely in furtherance of the scheme. *See Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."), citing *United States v. Kenofskey,* 243 U.S. 440, 442–43, 37 S.Ct. 438, 438–39, 61 L.Ed. 836 (1917) (holding that life insurance agent who delivered fraudulent death claim to his superior officer knowing that claim would be mailed by latter in course of business to home office is liable for devising scheme to defraud by use of mails). Second, it is inconceivable that the defendants, including Severn, (if they did any of the following acts at all) would not have at some point used the mails and wires, as the Kerbys allege, · to send "kickback" and "referral fee" information to mortgage brokers, pull credit reports of borrowers, transfer monies between each other, send processed loan applications to Countrywide, send executed loan papers amongst themselves, send the borrowers copies of the loan documentation after closing, among other alleged uses of the mails and wires. (Pl.'s 1st Am. Compl. ¶¶ 102–03.) In this case, with one exception,[4] the alleged mail and wire transmissions were between the defendants and themselves or third parties, and not between the defendants and the Kerbys. *See Vicom,* 20 F.3d at 778 n. 5 ("Exceptions to individualizing defendants' roles do exist—e.g., ... when such information is uniquely within the defendant's knowledge." (citing *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992))); *Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.,* 886 F.Supp. 1134, 1142 (S.D.N.Y.1995) ("Rule 9's strictures are relaxed where the alleged fraud concerns facts 'peculiarly within the opposing party's knowledge' " (quoting *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987))); *Windsor,* 564 F.Supp. at 280 (holding Rule 9(b) satisfied, allowing plaintiffs to use discovery to reveal the "particular circumstances regarding the alleged mail fraud such as the relevant dates the mails were used to perpetrate defendants' kickback scheme").[5]

Countrywide advances many of the same arguments offered by Severn, which the court also rejects. The Kerbys allege that Countrywide received the benefits of the

---

**4.** The Kerbys allege that copies of the completed loan documents were mailed to them after closing, but they also allege that these documents merely confirm the information on the Good Faith Estimate, which is attached to the complaint as Ex. A.

**5.** Severn also claims that there is "absolutely no basis" for the allegation that Mortgage Funding represented to the Kerbys that it was procuring the lowest rate available to the borrower. (Severn Mem. Supp. Mot. To Dismiss at 20.) That may be, but on a motion to dismiss the court must accept the factual allegations as true. If Severn later contests this fact in a motion for summary judgment, the Kerbys will have to provide evidence beyond their pleadings. *See* Fed. R.Civ.P. 56(e).

higher interest rate loans, and paid a yield spread premium to Mortgage Funding, through Severn, for referring them to Countrywide. Although it is true that Countrywide purchased the loan from Severn in the secondary market, that transaction was pre-arranged; for the loan brokered by Mortgage Funding and granted by Severn was allegedly pre-sold to Countrywide in exchange for its payment of the yield spread premium to Severn, which then forwarded all or part of it to Mortgage Funding. Countrywide cites to *Weill v. Dominion Resources, Inc.*, 875 F.Supp. 331, 339 (E.D.Va.1994) for the proposition that the court need not accept inferences drawn by the plaintiff if such inferences are unsupported by facts set out in the complaint. While the court certainly agrees with that proposition in the abstract, *Weill,* a securities fraud strike suit, is readily distinguishable from this case. In *Weill,* the plaintiff alleged, for example, that defendants made *"suggestions* in 1989 that Bill Stewart be replaced," made *"inappropriate and critical* remarks about Power Co. officers," and made "use of Power Co. personnel *in a way that violated the spirit* if not the letter of the 1986 SCC [sic] Order." *Id.* at 338 (emphases in original) (holding these allegations vague and conclusory). As previously explained, here the Kerbys have alleged Countrywide's role in the scheme, the benefit it received, and the use of the mails and wires to further the fraud. Given the flow of the loans from Mortgage Funding to Severn to Countrywide (all through the offices of Major Title, owned in common with Mortgage Funding) and the benefits each received along the way, it is possible to draw an inference of concerted fraudulent activity. While Countrywide's culpability will of course turn on whether it intended the alleged fraud, Rule 9(b) requires only that state of mind be averred generally, which the Kerbys have done.

Countrywide compares itself to Freddie Mac and Fannie Mae, because "each of these government-sponsored entities also 'provide the funds' [sic] by buying loans, and 'benefit' [sic] from the interest rates provided. This hardly constitutes fraud." (Countrywide Reply Pl.'s Opp. Mot. Dismiss at 2). But in making this comparison Countrywide leaves out the yield spread premium it paid to

Mortgage Funding via Severn in the pre-sold transaction. In the same vein, Countrywide in its initial brief argued that a "yield spread premium is merely another method through which a borrower can compensate a mortgage broker. It is widely recognized that mortgage brokers provide valuable services to borrowers ...." (Countrywide Mem. Supp. Mot. Dismiss at 3.) Countrywide cites to two cases finding yield spread premiums to be "legal and proper" under RESPA, 12 U.S.C.A. § 2607(a), but those cases did not address the situation alleged here, that of the yield spread premium payor's involvement in a fraudulent scheme to dupe people like the Kerbys. *See Barbosa v. Target Mortgage Corp.*, 968 F.Supp. 1548, 1553 (S.D.Fla.1997) (noting that, although "plaintiffs tell a troubling tale ... [t]he instant motion presents a set of narrow questions arising under a discrete federal statute," RESPA); *Culpepper v. Inland Mortgage Corp.*, 953 F.Supp. 367, 372 (N.D.Ala.1997) (addressing only RESPA). Moreover, contrary to Countrywide's assertion, the blanket legality under RESPA of yield spread premiums is far from clear, as both courts held on their own facts that the payments were legal, while noting that other courts had reached contrary results on different records. *Barbosa,* 968 F.Supp. at 1554–55; *Culpepper,* 953 F.Supp. at 372 n. 8; *see also* John Roddy, *Residential Mortgage Litigation: Yield Spread Premium "Upselling" and Mortgage Loan Payoff Charges,* 989 Prac. Law Inst., Corp. Law 471, 491 (1997) (arguing that *Culpepper* contradicts the literal terms of the relevant RESPA regulations); *id.* at 491–92 ("concluding that for the time being, it is clear that any lender that engages in yield spread premium 'upselling' is living quite dangerously"). In any event, as the Kerbys' RICO claim is predicated on mail fraud and not a RESPA violation, it does not stand or fall on the legality of the yield spread premium under those statutes. *Cf. Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1347 (7th Cir.1995) (reversing district court's dismissal of § 1962(c) RICO claim based on mail fraud because plaintiff failed to allege either a violation of the Truth in Lending Act or a fiduciary relationship). "There is a state of facts consistent with the complaint that if proved

would establish a violation of the mail fraud statute, and no more is required at this stage for the suit to continue." *Id.* at 1348 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989)) (reversing dismissal of RICO complaint).

The charges against Mr. Hyatt, however, must be dismissed. Short of alleging that he is Severn's president, the Kerbys provide no "circumstances" implicating him directly in the scheme. *See Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993) (holding that under § 1962(c) "*some* part in directing the enterprise's affairs is required"). The RICO charges against Mr. Hyatt will be dismissed.

### 3. *Pendent Fraud–Based Claims*

Counts 7–9 and 13 allege pendent fraud-based claims against all defendants under Maryland law, which various of the defendants move to dismiss,[6] asserting the same Rule 9(b) lack of specificity in pleading arguments just discussed in the context of the RICO claim asserted in Count 10. Specifically, Mortgage Funding and Mr. Friedman, Countrywide and Major Title move to dismiss Counts 7 (Common Law Fraud—Concealment) and 8 (Constructive Fraud). Countrywide and Major Title also move to dismiss Counts 9 (Conspiracy) and 13 (Violation of the Maryland Consumer Protection Act). And Mortgage Funding moves to dismiss Count 6 (Common Law Fraud—Inducement). (Count 6 was directed only against Mortgage Funding and not the other defendants.) For the reasons stated in the RICO discussion, these motions will all be denied.

### 4. *Breach of Fiduciary Duty, and Aiding and Abetting Breach of Fiduciary Duty*

In Count 5 the Kerbys allege that Mortgage Funding and Mr. Friedman committed the Maryland tort of breach of fiduciary duty by falsely promising to obtain for them the lowest possible mortgage rate and then sharing in the yield spread premiums. This claim will be dismissed, as Maryland recognizes no "universal or omnibus tort for the redress of breach of fiduciary duty," at least in a situation where other remedies exist, which is the case here as shown by the Kerbys' RESPA, TILA, breach of contract and various fraud claims. *Kann v. Kann*, 344 Md. 689, 690 A.2d 509, 521 (1997). Count 12 will also be dismissed, as it alleges that the other defendants aided and abetted Mortgage Funding's breach of fiduciary duty.

### 5. *Remaining Issues*

Major Title's motion to dismiss Count 11 (Intentional Interference with Contractual Relations) will be denied. *See Sharrow v. State Farm Mutual Automobile Ins. Co.*, 306 Md. 754, 511 A.2d 492, 497 (1986) (defining tort as "intentional interference by a third party with another in his business or occupation [which] induces a breach of an existing contract"). Given the allegation that both Major Title and Mortgage Funding were controlled by Mr. Friedman (and the Doe defendants), it is possible to draw an inference that Major Title both knew of and intended to interfere with the alleged contract between Mortgage Funding and the Kerbys.

Mortgage Funding and Mr. Friedman's motion to dismiss the punitive damages claim is denied. *See Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 652 A.2d 1117, 1129 (1995) (holding that "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages").

The court also notes that the Kerbys have clarified that Count 4 (Breach of Contract) was alleged against Mortgage Funding only, and not against Mr. Friedman.

---

**6.** It does not appear that Mr. Hyatt has moved to dismiss these claims.