**POLAR COMMUNICATIONS CORP., Plaintiff,**

v.

**ONCOR COMMUNICATIONS, INC., Defendant.**

**No. PJM 95–3544.**

United States District Court, D. Maryland, Southern Division.

June 12, 1996.

David A. Holzworth, Washington, DC, for Plaintiff.

Michael R. Klein, William R. Richardson, Jr., Thomas M. Clark, Wilmer, Cutler & Pickering, Washington, DC, for Defendant.

*OPINION*

MESSITTE, District Judge.

### I.

Polar Communications Corporation ("Polar") sues Oncor Communications, Inc. ("Oncor") seeking damages and declaratory and injunctive relief pursuant to 47 U.S.C. §§ 201, 206,[1] 207, and 401(b)[2] and 28 U.S.C. §§ 2201 and 2202. Oncor has moved to dismiss the Complaint for lack of subject matter jurisdiction and Polar has moved for partial summary judgment.[3] The Court will DENY both motions without prejudice. The Court *sua sponte* will grant Oncor leave to file a Motion to Stay this action pending arbitration.

### II.

Oncor provides long distance connections between local telephone exchanges while Polar telemarkets such services to public telephone owners and operators. In June 1991, Telesphere Communications, Inc. ("Telesphere"), Oncor's predecessor, entered into a "Public Pay Telephone Independent Sales Contractor Agreement" with Polar (the "Contract"), whereby Polar was to solicit customers for whom Telesphere would serve as the Primary Interexchange Carrier ("PIC") for public pay telephones on the customers' properties. The Contract provided that Telesphere would pay Polar commissions and surcharges based on the lines Polar had secured. Sometime prior to May 1994, when the Contract was amended, Oncor assumed Telesphere's position.

During the course of its involvement in the Contract, Oncor became the focus of a Federal Communications Commission ("FCC") investigation into what is known as "slamming" lines, i.e. the practice of changing a customer's PIC without the customer's authorization. On March 31, 1995, finding that Oncor had "willfully and repeatedly violated [FCC] rules and orders" by slamming lines, the FCC issued Oncor a Notice of Apparent Liability for Forfeiture (the "Notice"). The Notice stated that, based on the FCC's review of the facts and circumstances surrounding the violations, Oncor was apparently liable in the amount of $1,410,000. On September 20, 1995, Oncor entered into a Consent Decree with the FCC (the "Consent Decree" or the "Decree"), in which it agreed to pay a $500,000 "voluntary contribution to the United States Treasury." An FCC Order of the same date incorporated the Consent Decree and terminated the investigation of Oncor.

Oncor's alleged compliance with the Consent Decree has given rise to the present litigation. Since September 20, 1995, it has relied on the Decree as justification for refusing to pay Polar approximately $40,000 per month in commissions and surcharges that it previously had been paying under the Contract. Oncor contends that the Decree requires it to do this. Oncor says that under the Decree it must terminate payments to contractors who have submitted unauthorized PIC changes,[4] that Polar is a "slammer" and is covered by the Decree, and that Oncor is

---

1. Section 206 provides: "In case any common carrier shall do, or cause to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation...."

2. Section 401(b) provides: "If any person fails or neglects to obey any order of the [Federal Communications] Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby ... may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the

order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order...."

3. Oncor's unopposed motion for leave to file a surreply to the summary judgment motion will be GRANTED.

4. The relevant language is at Paragraph 19(c) of the Consent Decree, in which Oncor agrees to "[t]erminate the payment of any commissions or surcharges to, and any contract or agency agreement with, any individual or entity that is submitting, or has submitted in the past, requests for unauthorized PIC changes, or is not in compliance with paragraphs 12, 13, 14, 15, 16, 17, or 18 of this Consent Decree."

therefore precluded from honoring its contractual obligations.

Polar counters that the Decree cannot possibly mean what Oncor says, because such an interpretation would allow Oncor to keep revenue that either (1) belongs to Polar or (2) is the product of illegal slamming practices. Polar alleges: "The actions of Oncor in systematically converting commission payments and surcharges due and owing to Polar in order to circumvent and evade the fine imposed by the FCC Consent Decree and to shift the burden of the penalty for Oncor's egregious and willful misconduct in slamming telephone lines constitutes disobedience of an order of the FCC within the meaning of 47 U.S.C. [§] 401(b)."

Polar's argument is not unappealing, but Oncor adds an important wrinkle. As a fallback, it argues that this case actually should not be in court at all. It says that at bottom this is a breach of contract suit which Polar has attempted to disguise as a tort suit in order to avoid the binding arbitration clause of the Contract. At the same time, Oncor suggests, what Polar really wants is for the Court to render an advisory opinion on the meaning of the FCC Decree.

### III.

■ Parties may plead alternative theories of liability, indeed as many theories as the facts will fit. Fed.R.Civ.P. 8(e)(2). What they cannot do, however, is dress what is essentially a contract case in the garb of tort or other theories in order to avoid the effect of a compulsory arbitration clause. *See Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress Int'l, Ltd.,* 1 F.3d 639, 643 (7th Cir.1993); *Altshul Stern & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.,* 385 F.2d 158, 159 (2d Cir.1967). The test is not whether claims other than contract claims are capable of being stated, only whether the contract claim predominates. When the contract claim subject to compulsory arbitration predominates, the trial court has full discretion to stay the case as to all claims. *See M & I Electric Indus., Inc. v. Rapistan Demag Corp.,* 814 F.Supp. 545, 547 (E.D.Tex.1993) ("[S]tays of nonarbitrable causes of action are within the court's discretion to control its docket."); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 856 (2d Cir.1987) ("Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit."); *cf. Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20 n. 23, 103 S.Ct. 927, 939 n. 23, 74 L.Ed.2d 765 (1983) (decision whether to stay litigation among non-arbitrating parties pending the outcome of arbitration is left to the trial court's discretion). If this were not so, a party could nullify compulsory arbitration clauses at will simply by artful pleading. But, as has become axiomatic, binding arbitration clauses will be enforced. 9 U.S.C.A. § 2 (West 1970); *see also Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

■ There can be no doubt that this is quintessentially a contract dispute. A written contract exists between the parties; one party has allegedly performed services and is supposed to receive compensation according to terms set out in the contract, i.e. it has performed; the other party has not paid for the services according to the terms of the contract, i.e. it has not performed; and the first party sues for non-payment, i.e. for nonperformance. That is contract pure and simple. Assuming other viable causes of action could be stated, it is clear that the contract claim would predominate.

But both parties, at least as a first-line position, seek to have the Court interpret the FCC Decree, which may or may not be relevant to the contract dispute. The Court takes no position on the relevancy much less the meaning of the Decree at this time. That enterprise, in the Court's view, is premature. Still looming at the threshold is the Contract's compulsory arbitration clause which Oncor, though with something less than crystal clarity, appears to want to have enforced. If that is what Oncor wants, then the Court believes its request should be made forthrightly. Oncor will therefore be granted fifteen days to either file such a

motion or to waive arbitration.[5] Polar will have fifteen days thereafter to respond.

In the meantime, the Court will deny Polar's Motion for Partial Summary Judgment but will grant it leave to refile at such time as this litigation may go forward.

## IV.

An Order will be entered in accordance with this Opinion.

---

**5.** The Court expresses no view as to whether Oncor has already waived whatever right it may have to arbitrate by reason of its participation in the litigation to this point. *See, e.g., Radiator Specialty Co. v. Cannon Mills, Inc.,* 97 F.2d 318, 319 (4th Cir.1938) (holding that right to arbitrate and to stay an action pending arbitration may be waived by participation in litigation).