SWEDISH CIVIL AVIATION ADMIN.

v.

PROJECT MANAGEMENT
ENTERPRISES, INC.

No. CIV.A. DKC 2001–1507.

United States District Court,
D. Maryland.

March 14, 2002.

William Paul Atkins, Pillsbury Winthrop LLP, McLean, VA, Christopher R. Wall, Roxane A. Polidora, Pillsbury Winthrop LLP, Washington, DC, for Plaintiff.

Michael D. Hays, Jonathan B. Hill, Dow Lohnes and Albertson, Washington, DC, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this breach of contract and fraud case is the motion of the Defendant, Project Management Enterprises, Inc. ("PMEI"), to dismiss all counts against it pursuant to Fed R. Civ. P 12(b)(6) for failure to state a claim, and in part for failure to plead fraud with specificity under Fed.R.Civ.P. 9(b). The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For reasons that follow, PMEI's motion to dismiss will be granted in part and denied in part.

### I. Background

The following facts are alleged by Swedish Civil Aviation Administration ("SCAA") in its complaint. SCAA is the state enterprise in charge of the safety and oversight of civil aviation in Sweden. Pursuant to urging by the International Civil Aviation Organization ("ICAO"), a regulatory body which develops international aviation safety standards, SCAA began to develop a concept utilizing new technology whereby aircraft transmit their positions from a receiver on board the aircraft over a radio data link with or without the support of ground stations. This new technology,

named VDL Mode 4 by ICAO, is radically different from the ground-based radar air traffic control systems currently in operation. If properly implemented, SCAA alleges that VDL Mode 4 technology would replace the current navigation and surveillance infrastructure, thereby improving traffic flows and safety while reducing costs.

From 1990–1994, SCAA verified, refined and tested the prototype VDL Mode 4 technology, sponsoring several demonstrations for the international aviation community. After responding positively to these demonstrations, several international aviation entities requested in 1994 that SCAA create international standards for the technology through ICAO so that the technology could be implemented throughout the world.

ICAO, formed under the auspices of the United Nations, consists of 185 member states, including the United States. One of the primary activities of ICAO is to implement international standards and recommended practices and procedures for the technical fields of aviation. ICAO develops these standards through expert panels and working groups comprised of the member states. When a working group determines that a draft standard it has developed is sufficiently comprehensive after debate and revisions, it refers the draft standard to an ICAO Validation Subgroup ("VSG") which further reviews and validates the standard, ultimately submitting it to the ICAO Secretariat. The Secretariat circulates the draft standard to the member states for comments and subsequently to the ICAO Council for a vote to approve it. Upon approval, the standard is incorporated into the appropriate Annex to the CONVENTION ON INTERNATIONAL CIVIL AVIATION. Each ICAO member state is free to implement the standard in its own territory or provide notice to ICAO of the differences between its standard and that of ICAO.

In late 1994, after deciding to attempt to standardize its version of the VDL Mode 4 technology through the ICAO process, SCAA determined that it would need to retain an English-speaking confidential consultant to help draft submissions to the ICAO working group and assist SCAA with the ICAO process. SCAA interviewed a number of technical consulting firms to determine which best possessed the requisite technical expertise in air traffic control technology and familiarity with the ICAO standardization process.

One of the firms SCAA interviewed was PMEI, a Bethesda, Maryland consulting firm whose president is Prasad Nair. SCAA had become familiar with him during ICAO meetings in the early 1990's. At that time, Nair was a member of the United States Federal Aviation Administration ("FAA") delegation to ICAO. In late 1994 and early 1995, Johnny Nilsson of SCAA interviewed Nair several times. Nair, who articulated the merits of and expressed his support for the new VDL Mode 4 system he had witnessed in Sweden, emphasized PMEI's expertise in aviation communications systems and its familiarity with the ICAO process.

Nair represented to SCAA that PMEI could provide valuable and unique confidential consulting and technical support services with respect to drafting the standard for VDL Mode 4 technology and advancing SCAA's position in the ICAO standardization process. Relying on PMEI's representations, SCAA accepted PMEI's proposal to provide confidential consulting and technical support in a January 23, 1995, letter from Kenneth Eideberg of SCAA to Nair. The parties agreed that the information provided and the work performed would be kept confidential.

On January 28, 1995, Nilsson and Dr. Hakan Lans, the inventor of the VDL Mode 4 technology, both representing SCAA, met with Nair at PMEI's offices in Bethesda to conduct a "project launch meeting." At this meeting, the parties agreed to the scope and content of materials to be drafted and submitted to ICAO, including an agreement that PMEI would prepare the initial draft standards and recommended practices and guidance materials for SCAA's review. The parties agreed that they would review and refine those materials through discussion, with PMEI acting in confidence and in a manner that would further SCAA's interests.

In a February 15, 1995, letter from Nair to Eideberg, PMEI presented SCAA with a description and schedule of its immediate tasks and requested an advance payment to cover costs for its initial work and expenses. PMEI informed SCAA it would bill on a monthly basis and that payment would be due within 30 days of receipt of PMEI's invoices. SCAA began paying PMEI on this schedule.

SCAA and PMEI met several times to review and discuss developmental aspects of the VDL Mode 4 technology. During the course of these conversations, SCAA provided confidential information and a relationship of trust and mutual respect developed between SCAA and PMEI. Using this confidential information, PMEI prepared draft standards and recommended practices and attended ICAO working groups and meetings. After a May 1995 ICAO meeting in which the ICAO panel established the process for drafting international standards for the VDL Mode 4 technology, PMEI submitted a proposed budget to SCAA laying out anticipated fees and expenses arising from its continued consulting services. PMEI performed as a confidential consultant through 1995, 1996, and 1997 in order to support SCAA's efforts to gain standardization of its tech-nology, gaining access to these working groups by virtue of its status as an SCAA representative. During this time, SCAA routinely shared confidential information with PMEI and PMEI presented papers and working materials to SCAA for review prior to presentation before the ICAO working groups.

In April 1997, the ICAO working group determined that the draft standards for the VDL Mode 4 technology sponsored by SCAA were sufficiently mature to be verified and validated by an ICAO VSG.

The complaint then alleges that, beginning in late 1997 and 1998, PMEI failed to provide SCAA with copies of the draft standards and working materials in a timely manner prior to their submission to the ICAO VSG, thereby prohibiting SCAA's ability to review and approve documents in advance. At the same time, PMEI began to undermine SCAA's position in the ICAO process by inserting its own unapproved changes and analyses into the draft standards and working materials submitted to the VSG. Further, PMEI publicly advocated positions at ICAO sessions that it knew to be contrary to the positions advocated by SCAA and, SCAA alleges on information and belief, made disparaging comments and remarks to other ICAO members about the fundamental technology underpinning the SCAA sponsored VDL Mode 4 technology.

SCAA alleges that PMEI began using confidential information it gained from its consultant relationship with SCAA to begin preparation for manufacturing and selling equipment using VDL Mode 4 technology and, from 1997 to the present, has provided pricing information for such equipment to airlines and aviation manufacturers. Further, PMEI created an affiliated company, Aviation Data System Innovations, LLC ("ADSI"), to produce and market the VDL Mode 4 related equip-

ment and computer software. This equipment and software was developed using the confidential information provided by SCAA to PMEI. Nair, PMEI's president, is also the president of ADSI, which operates out of PMEI's Bethesda office.

Through 1998, PMEI continued to undermine SCAA's position in the ICAO standardization process by altering the SCAA sponsored technical concept through the advocacy of what SCAA characterizes as unnecessary changes to the developing standard. For example, during a May 24–28, 1998, VSG meeting, PMEI advocated for the incorporation of a "rapid net entry" conceptual element into the draft ICAO standard for VDL Mode 4 technology despite SCAA's objection to the inclusion of the concept. Rapid net entry significantly altered and diminished SCAA's original concept for the technology.

In a December, 1998, VSG meeting, PMEI specifically and deliberately opposed an SCAA proposal concerning a particular ground synchronization method and, when pressed by SCAA to explain its position, stated that it was not at liberty to explain its position or actions. SCAA was forced to expend time and resources to respond to PMEI's allegations disparaging its version of the VDL Mode 4 technology, in addition to the $2,066,544.21 it paid to PMEI for consulting services between January 1995 and January 1999.

Since January 1999, PMEI has remained privy to ICAO proceedings through its manufacture and sale of VDL Mode 4 technology, an activity SCAA alleges was made possible solely by the confidential information provided to PMEI by SCAA. SCAA alleges that PMEI attempted to hinder the feasibility and marketability of SCAA's original VDL Mode 4 technology by delaying the standardization process through the introduction of numerous changes to the original concept.

PMEI did this, SCAA alleges, so that it could profit from the marketing of its competing version of the technology and by providing consulting services to other international aviation entities.

SCAA brings a thirteen count complaint alleging breach of contract, fraud, and a variety of quasi-contract and tort claims based on the factual allegations set forth above. In response, PMEI moves to dismiss all counts.

## II. Standard of Review

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Comet Enters. Ltd. v. Air–A–Plane Corp.*, 128 F.3d 855, 860 (4th Cir.1997). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. ——, 122 S.Ct. 992, —— L.Ed.2d —— (2002), *quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir.1997). The court must disregard

the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal conclusions, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.1979).

## III. Analysis

SCAA alleges that PMEI misrepresented itself to SCAA in order to gain access to confidential information relating to SCAA's version of VDL Mode 4 air traffic technology. Further, SCAA alleges that PMEI used this information for its own purposes, including engaging in other consulting contracts, marketing and selling its own VDL 4 software and hardware, and seeking ICAO approval of its own system while purportedly representing SCAA's interest before the ICAO. All of SCAA's claims against PMEI arise out of (1) representations of PMEI which allowed it to create a relationship with SCAA and gain access to confidential information, (2) PMEI's alleged misuse of this information, and (3) PMEI's alleged failure to disclose conflicts of interest between its independent marketing of alternative technology and its relationship with SCAA.

### A. Breach of Contract and Quasi–Contract claims

#### 1. Breach of Contract (Count IV)

■ PMEI contends that SCAA's pleading is insufficient because the complaint merely alleges that PMEI was obligated to provide SCAA with confidential consulting, but does not allege that PMEI breached this obligation. Further, PMEI seeks to establish that it has not violated the plain language of a "Letter Agreement" in which Eideberg references earlier discussions of the parties leading to an agreement. Paper no. 11, at 3. Whether these or any other provisions are part of the contract has yet to be determined, but SCAA's allegations as to what constituted the contract and its breach are sufficient to state a claim. In order to survive a motion to dismiss, a complaint for breach of contract must allege facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant. *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 279 Md. 476, 480, 369 A.2d 566 (1977). At this stage, SCAA does not have to forecast evidentiary support for its allegations.

■ SCAA alleges that there was a contractual agreement reached by the parties in 1995 whereby PMEI agreed to provide SCAA with confidential consulting and aid SCAA in its efforts to gain an ICAO standard for its technology. The complaint further alleges that as of 1998, PMEI breached the contract by failing to provide the contracted for consulting services, by undermining SCAA's efforts to gain ICAO approval for its technology, and by sharing confidential information it had gained in the course of the consulting relationship with other parties. Furthermore, PMEI asserts that it is insufficient for the complaint to allege that PMEI, "engag[ed] in activities that directly undermined the purpose, spirit, and benefit of the services it was contractually obligated to provide to SCAA." Paper no. 8, at 17, *quoting* Complaint, at ¶ 80. While PMEI argues that SCAA must allege the breach of a particular contractual provision, a breach of contract does occur if it "affects the purpose of a contract in an important or vital way." *Sachs v. Regal Bank, FSB*, 119 Md.App. 276, 283, 705 A.2d 1 (1998). These allegations are sufficient to state a claim for

breach of contract. Accordingly, the motion to dismiss is denied as to Count IV.

### 2. Pleading in the alternative (Counts V, XI, and XIII)

PMEI argues that Count V for Money Had and Received, Count XI for Unjust Enrichment and Count XIII for *Quantum Meruit* must be dismissed because they are quasi-contract claims for which there can be no recovery when there exists an express contract between the parties. Paper no. 8, at 17–19. SCAA does not challenge that these are quasi-contract claims and contends, in contrast, that PMEI seeks to preclude it from pleading causes of action in the alternative.

 Quasi-contract remedies are equitable remedies that permit recovery, "where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *County Commissioners v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600 (2000). PMEI is correct that, "no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests...." *J. Roland Dashiell*, 358 Md. at 96, 747 A.2d 600, *citing Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 776, 471 A.2d 1121 (1984). However, although SCAA may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute.

In challenging SCAA's claim for breach of contract, PMEI argues that SCAA fails to allege the existence of a contract which PMEI breached. Here, alternatively, PMEI argues that, because SCAA alleges that there was a contract, SCAA cannot state a claim for quasi-contract. However, Fed R. Civ. P. 8(e)(2) states, in pertinent part, "[a] party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal [or] equitable... grounds." "Parties may plead alternative theories of liability, indeed as many theories as the facts will fit." *Polar Communications Corp. v. Oncor Communications, Inc.*, 927 F.Supp. 894, 896 (D.Md.1996); *see also Int'l Customs v. Ford Motor Co.*, 893 F.Supp. 1251, 1257 (S.D.N.Y.1980) (*quantum meruit* and breach of contract can be plead in alternative).

One Florida case cited by the court in *J. Roland Dashiell*, 747 A.2d at 608 n. 8, makes explicit that quasi-contract claims are appropriate unless it is proven that there is an express contract: "It is only upon a showing that an express contract exists that the unjust enrichment or promissory estoppel count fails.... Until an express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment on these grounds is premature." *Mobil Oil Corporation v. Dade County Esoil Management Co.*, 982 F.Supp. 873 (S.D.Fla.1997), *citing H.L. McNorton v. Pan American Bank of Orlando*, 387 So.2d 393, 399 (Fla. 5th DCA 1980). Accordingly, SCAA may plead both contract and quasi-contract claims in the alternative.

### 3. Unjust enrichment (Count XI) and quantum meruit (Count XIII)

 PMEI makes arguments for the dismissal of SCAA's unjust enrichment and *quantum meruit* claims that fail for similar reasons. In order to support a claim for unjust enrichment under Maryland law, a plaintiff must establish:

(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit un-

der such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Abt Associates* v. JHPIEGO, 104 F.Supp.2d 523, 535 (D.Md.2000), *citing Everhart v. Miles,* 47 Md.App. 131, 422 A.2d 28 (1980). PMEI argues that SCAA does not allege that PMEI was unjustly enriched by the payments, access to meetings, and confidential information provided by SCAA, but rather by third-party consulting agreements entered into by PMEI.

To state claim for *quantum meruit:*

Three elements must be established by a plaintiff in order to sustain a claim for *quantum meruit:* "(1) [a] benefit conferred upon the defendant by the plaintiff; (2)[a]n appreciation or knowledge by the defendant of the benefit; and (3)[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value."

*Paramount Brokers, Inc. v. Digital River, Inc.,* 126 F.Supp.2d 939 (D.Md.2000), *quoting Everhart,* 47 Md.App. at 136, 422 A.2d 28; *See also First Union National Bank v. Meyer, Faller, Weisman, & Rosenberg, P.C.,* 125 Md.App. 1, 23, 723 A.2d 899 (1999) ("By its term, *quantum meruit* is a method of obtaining a reasonable value for services.", *quoting Attorney Grievance Comm'n v. McIntire,* 286 Md. 87, 92–93, 405 A.2d 273 (1979)). PMEI argues that SCAA fails to allege that it provided PMEI with services and so does not state a claim for *quantum meruit.*

■ In making both arguments, PMEI too narrowly interprets the definition of services and benefits. Confidential information and other non-monetary assets can be a benefit conferred in an unjust enrichment claim. *See Reynolds v. Whitin Mach. Works,* 167 F.2d 78, 86 (4th Cir. 1948) (unauthorized use of confidential in-

formation unjustly enriched party breaching confidentiality); *Carter Prods., Inc. v. Colgate–Palmolive Co.,* 214 F.Supp. 383 (D.Md.1963) (misappropriation of trade secrets entitles injured party to award of profits on basis of unjust enrichment). As SCAA argues, the third-party consulting agreements were not the unjust benefit alleged to be conferred on PMEI, but rather an example of how PMEI used the benefits of the confidential information provided by SCAA to gain enrichment. Similarly, *quantum meruit* allows a party who has rendered a service, or supplied work, labor and materials, to recover the value of the service provided to the defendant. *W.F. Magann Corp. v. Diamond Mfg. Co., Inc.,* 775 F.2d 1202, 1207–1208 (4th Cir.1985). SCAA alleges that it provided time, resources, materials, and confidential information about the VDL 4 technology and how to deploy it as well as access to the ICAO meetings and potential business partners. SCAA has alleged that it provided both services and benefits to PMEI that fit the definitions for the purposes of stating unjust enrichment and *quantum meruit* claims. Accordingly, the motion to dismiss is denied as to Counts XI and XIII.

### 4. Breach of Duty of Good Faith and Fair Dealing (Count III)

■ In Count III, SCAA alleges that PMEI breached the duty of good faith and fair dealing when it provided compensable services to entities with interests adverse to SCAA and also when it covertly marketed an alternative version of the VDL Mode 4 technology while it was consulting for SCAA regarding the standardization of SCAA's version of the technology. Under Maryland law:

Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521,

534, 200 A.2d 166 (1964). However, Maryland courts have not explicitly recognized a separate cause of action for breach of this duty.

*Abt,* 104 F.Supp.2d at 534,; *see also Baker v. Sun Co.,* 985 F.Supp. 609, 610 (D.Md. 1997) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing."). The implied duty of good faith, "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker v. The Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521 (1992). However, the Court of Special Appeals did not go further and rule that there is a duty requiring affirmative steps beyond those required by the contract itself. *Id.*[1] Therefore, this duty is merely part of an action for breach of contract, *Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 677 (D.Md.1993), and so, because Count IV already states a claim for breach of contract, Count III does not state a different claim and will be dismissed.

### 5. *Estoppel claim (Count XII)*

PMEI asserts that SCAA's estoppel claim (Count XII) should be dismissed because equitable estoppel is not recognized in Maryland as an independent cause of action. However, PMEI mischaracterizes SCAA's claim, which is for promissory estoppel. PMEI's accusation in its reply memorandum that SCAA did not mention "promissory estoppel" in its complaint and waited to assert it until its opposition brief

is groundless because the federal standard is notice pleading, *Swierkiewicz,* 534 U.S. at ——, 122 S.Ct. 992; *Karpel v. Inova Health System Servs.,* 134 F.3d 1222, 1227 (4th Cir.1998). SCAA never mentioned "equitable estoppel" and pled facts under the heading "estoppel" which state a claim for promissory estoppel, sufficiently putting PMEI on notice that SCAA is stating a promissory estoppel claim. PMEI attempts to raise alternative grounds for dismissal in its reply memorandum that were not included in its motion to dismiss. SCAA has not had an opportunity to address them. Accordingly, the motion to dismiss is denied as to Count XII for promissory estoppel.

### B. *Fraud (Count II), Negligent Misrepresentation (Count VIII), and Overt False Misrepresentations (Count IX) Claims*

PMEI argues that SCAA's claims for fraud and misrepresentation in Counts II, VII and IX must be dismissed because they are barred by the statute of limitations, redundant, fail to allege a relationship beyond mere contract which could give rise to a duty in tort, and are not pled in accordance with Fed.R.Civ.P. 9(b). For reasons stated below, only Count IX will be dismissed.

### 1. *Statute of Limitations (Counts II, VII, and IX)*

█ PMEI argues that SCAA has admitted it was on notice or should have been on notice of any alleged fraud as

---

1. SCAA argues that in *Maryland National Bank v. Traenkle,* 933 F.Supp. 1280, 1289 (D.Md.1996), the court allowed a plaintiff to pursue parallel claims of breach of duty of good faith and fair dealing and breach of contract. Such a reading of that case is incorrect. In that case, a single count alleged "breach of contract, duty of good faith and fair dealing." *Id.* at 1288. The plaintiff's

allegation in that case was, essentially, that the defendant breached the contract when it breached its duty of good faith and fair dealing. Thus, *Traenkle* supports the notion that breach of the duty of good faith and fair dealing is part of a breach of contract claim and cannot support bringing a *separate* cause of action.

early as December 1997, more than three years before the May 23, 2001, filing of the complaint and, thus, the statute of limitations should bar SCAA's fraud claims. The statute of limitations is an affirmative defense that typically must be raised in a pleading under Fed.R.Civ.P. 8(c) and is not usually an appropriate ground for dismissal. However, under Maryland law, "[i]f the time bar—whether part of the cause of action itself or merely a condition to the remedy—is apparent on the face of the complaint, the complaint would indeed fail to state a claim *upon which relief can be granted.* A motion to dismiss would therefore be an appropriate, though not a necessary, way in which to assert that defense." *G & H Clearing and Landscaping v. Whitworth,* 66 Md.App. 348, 354, 503 A.2d 1379 (1986). The same standard of analysis is appropriate under the federal rules:

> Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.

*Brooks v. City of Winston–Salem, North Carolina,* 85 F.3d 178, 181 (4th Cir.1996), *citing Richmond F. & P. R.R. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993). *See also* 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1357, at 352 (1990) ("A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate). Therefore, the appropriate standard when analyzing the claim under Rule 12(b)(6) is whether it is clear from the face of the complaint that SCAA's fraud and misrepresentation claims are time barred.

In Maryland, a civil action must be filed within three years from the date it ac-crues. Md.Code Ann., Courts & Jud. Proceedings, § 5–101. The question of accrual in § 5–101 "is left to judicial determination." *Poffenberger v. Risser,* 290 Md. 631, 633, 431 A.2d 677 (1981), *citing Harig v. Johns–Manville Products,* 284 Md. 70, 75, 394 A.2d 299 (1978). "Depending upon the nature of the assertions being made with respect to the limitations plea, this determination may be solely one of law, solely one of fact or one of law and fact." *Poffenberger,* 290 Md. at 634, 431 A.2d 677. Under the discovery rule, which is generally applicable to all claims in Maryland, "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Id.,* 290 Md. at 636, 431 A.2d 677.

PMEI argues that SCAA should have been on notice from late 1997 when, it alleges, PMEI failed to provide it with copies of the draft standards and working materials as it had done previously. Paper no. 15, at 2–3. SCAA counters that it was not until December 1998, only two and a half years before filing, that PMEI's actions put it on notice that PMEI was engaged in conduct adverse to SCAA's interests. In December 1998, SCAA alleges that PMEI advocated positions at an ICAO VSG meeting that specifically and deliberately opposed an SCAA proposal concerning ground synchronization methods. Complaint, at ¶¶ 50–51. "[B]eing 'on notice' means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud." *O'Hara v. Kovens,* 305 Md. 280, 302, 503 A.2d 1313 (1986). Accrual of the limitations period should be tolled particularly where SCAA alleges that PMEI's fraud kept knowledge of its covert activities from SCAA. *See Frederick Road Ltd. Partner-*

*ship v. Brown & Sturm*, 360 Md. 76, 98, 756 A.2d 963 (2000). Therefore, despite the possibility that SCAA's suspicions might have been raised as early as December 1998, SCAA has alleged a set of facts sufficient to state that it was not "on notice" until PMEI took its public position adverse to SCAA's interests. Accordingly, because it is not clear from the face of the complaint that SCAA's fraud and misrepresentation claims are time barred, the statute of limitations is not an appropriate ground for dismissal.

*2. Redundancy (Counts VIII and IX)*

For reasons cited above in holding that SCAA can plead contract and quasi-contract claims in the alternative under Rule 8(a), SCAA can plead alternatively theories of liability, in this instance, fraud and misrepresentation. *See Polar Communications*, 927 F.Supp. at 896 ("Parties may plead alternative theories of liability, indeed as many theories as the facts will fit."). However, PMEI argues that negligent misrepresentation and overt false representation are not merely redundant in light of the fraud claim, but are not independent causes of action in Maryland. It is only partially correct.

■ Negligent misrepresentation is a separate and distinct tort from fraud under Maryland law. "The tort of negligent misrepresentation has been recognized in [Maryland]." *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 41, 517 A.2d 336 (1986), *citing Flaherty v. Weinberg*, 303 Md. 116, 135, 492 A.2d 618 (1985); *Martens Chevrolet, Inc. v. Seney*. 292 Md. 328, 439 A.2d 534 (1982). In *Martens*, the Court of Appeals of Maryland delineated the development of the tort of negligent misrepresentation in Maryland as a tort separate from fraud or deceit. *See Martens*, 292 Md. at 335–336, 439 A.2d 534, *citing Virginia Dare Stores v. Schuman*, 175 Md. 287, 1 A.2d 897 (1938) (allowing recovery for negligent misrepresentation as a cause of action separate from deceit); *See also Weisman v. Connors*, 312 Md. 428, 443, 540 A.2d 783 (Md.1988) ("We first recognized negligent misrepresentation as a tort action separate from deceit in *Virginia Dare . . .* ").

However, there is no separate tort of overt false representation in Maryland. SCAA cites *Nails v. S & R, Inc.*, 334 Md. 398, 639 A.2d 660 (1994), in support of its argument that overt false representation has its own pleading requirements and standards of proof. Not only are the elements listed by SCAA identical with those cites from *Lapides v. Trabbic*, 134 Md. App. 51, 758 A.2d 1114 (2000), as the elements for fraud, but the case itself describes the elements listed as those that must be proved by a plaintiff to recover for fraud or deceit. *Nails*, 334 Md. at 415, 639 A.2d 660. Accordingly, the motion to dismiss is granted as to Count IX for overt false representation on the ground that it does not state an independent cause of action.

*3. Confidential Relationship Giving Rise to a Duty (Counts II and VIII)*

■ PMEI contends that SCAA's fraud and negligent misrepresentation claims should be dismissed because SCAA did not plead that there existed a confidential relationship between the parties giving rise to a duty on the part of PMEI. PMEI argues first that SCAA merely alleges the breach of a contractual relationship which, it contends, cannot be the basis for a tort claim. In addition, PMEI argues that it cannot be liable for concealment (alleged in Count II for fraud and Count VIII for negligent misrepresentation) because SCAA has alleged no duty to disclose. SCAA's response to both of these arguments is that it did allege a confidential

duty relationship, beyond the mere contractual relationship, which arose over the course of dealing and a result of the nature of the dealing between the two parties.

In general, "Maryland does not recognize a cause of action for negligence arising solely from a contractual relationship between the two parties." *Lawyers Title Insurance Corp. v. Rex Title Corp.*, 282 F.3d 292, 2002 WL 266825, \* 1 (4th Cir. 2002), *citing Heckrotte v. Riddle*, 224 Md. 591, 595–596, 168 A.2d 879 (1961). PMEI cites cases to establish that fraud claims are inappropriate where the essence of the relationship between the parties is contractual. In *Abt*, 104 F.Supp.2d at 537, the court held that a plaintiff could not bring a cause of action for tortious interference with a contract when he was a party to the contract, "[w]here the essence of [the] relationship between the parties [was] contractual in nature...." *See also Loyola Fed. Sav. & Loan Ass'n v. Trenchcraft, Inc.*, 17 Md.App. 646, 656, 303 A.2d 432 (1973)(in Maryland, there is a higher standard of proof required for proving fraud in order to minimize the improper substitution of fraud actions for breach of contract). However, in *Lawyers Title*, the Fourth Circuit held that the Maryland rule "only bars a negligence action between contracting parties that rests *solely* on the contract." *Lawyer's Title*, 2002 WL 266825 at \*2, 282 F.3d 292. Therefore, the precedent relied upon by PMEI only supports dismissal if nothing more is alleged than a contractual relationship between the parties.

While " '[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort,' " tort liability can be imposed if there is, "an intimate nexus between the parties." *Jacques v. First National Bank of Maryland*, 307 Md. 527, 534, 515 A.2d 756 (1986), *quoting Heckrotte*, 224 Md. at 595, 168 A.2d 879. Whether there was a duty of care, then, depends on whether there was a relationship between the parties beyond the mere contract. In *Jacques*, the court found that a tort obligation did arise where the nature of loan financing provisions extended by a bank left the plaintiff "particularly vulnerable and dependant upon the Bank's exercise of due care." *Jacques*, 307 Md., at 540, 515 A.2d 756. In another case, the requisite special relationship existed where, "the parties dealt with each other over an extended period of time in order to consummate a close and potentially long lasting business relationship." *Lubore v. RPM Associates, Inc.*, 109 Md. App. 312, 338, 674 A.2d 547 (1996).

As in *Lubore*, in the current case, SCAA alleges that the parties worked together closely over an extended period to revise draft standards and review presentations for ICAO meetings, establishing a relationship of trust. Furthermore, as in *Jacques*, SCAA was placed in a vulnerable position because it alleges that it had to share confidential information about its technology with PMEI and rely on PMEI to represent its interests at ICAO meetings. Accordingly, SCAA sufficiently alleges the existence of a special relationship, beyond one solely based on contract, out of which a duty arises which can be the basis of SCAA's fraud and negligent misrepresentation claims.

### 4. Materiality (Count VIII)

 PMEI argues that Count VIII (negligent misrepresentation) should be dismissed because it fails to allege materiality.[2] PMEI characterizes this count as a

**2.** PMEI's arguments that Count IX should be dismissed for identical reasons are moot given the dismissal of Count IX above.

claim for fraud which requires that a plaintiff allege that "a material representation of a party was false." *Colandrea v. Colandrea*, 42 Md.App. 421, 428, 401 A.2d 480 (1979). However, Count VIII is not a claim for fraud, but a separate claim for negligent misrepresentation. In order to prove a claim of negligent misrepresentation, a plaintiff must prove:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens*, 292 Md. at 337, 439 A.2d at 539, citing *Virginia Dare*, 175 Md. 287, 1 A.2d 897 (allowing recovery for negligent misrepresentation as a cause of action separate from deceit). The misrepresentation must be of material facts. *Carozza v. Peacock Land Corp.*, 231 Md. 112, 188 A.2d 917 (1963).

■ While PMEI blithely asserts that SCAA asks the court to assume the materiality of the misrepresentations, it ignores extensive examples of factual misrepresentations alleged by SCAA. For example, SCAA alleges that PMEI gave it assurances that PMEI would provide confidential consulting, that SCAA relied upon those assurances in giving PMEI access to the confidential information, and that PMEI then used the confidential information to market its own version of that technology. Complaint, at ¶ 55. In addition, SCAA alleges that PMEI representated that it would guide SCAA's VDL Mode 4 technology through the ICAO

standardization process and that, as a result, SCAA allowed PMEI to represent it at the ICAO meetings. At those meetings, PMEI inserted unapproved changes into recommended draft standards and otherwise undermined SCAA's efforts to gain the ICAO standardization of its technology. *Id.*, at ¶ 43–44, 55. These facts are sufficiently material to state a claim for negligent misrepresentation.

### 5. Specificity (Counts II and VIII)

■ PMEI argues that SCAA's fraud and negligent misrepresentation claims must be dismissed for failure to plead with requisite specificity. Fed.R.Civ.P. 9(b) states, in pertinent part, that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purpose of this rule is, "to provide the defendant fair notice of the basis of plaintiff's claim and to protect defendant's reputation from groundless accusation of fraud incited by the possibility of an 'in terrorem increment' in the settlement value of a lawsuit." *T. Rowe Price New Horizons Fund, Inc. v. Preletz*, 749 F.Supp. 705, 710 (D.Md.1990) (internal quotations omitted).

PMEI counters that where it alleges affirmative fraud, it has done so with reference to particular incidents. For example, it alleges that the parties agreed during a January 28, 1995, "project launch meeting" that PMEI would provide services in confidence and act in SCAA's interests. Complaint, at ¶ 28. In addition, SCAA alleges that PMEI opposed SCAA's proposal regarding ground synchronization methods at a December 1998 ICAO VSG meeting while purportedly representing SCAA's interests. Complaint, at ¶ 51. SCAA argues that any lack of specificity is justified because the gravamen of its fraud allegations are that PMEI intentionally concealed its involvement with interests

adverse to SCAA. Despite the general rule regarding specificity, "[s]uch particularity cannot be met in a concealment case, however, because an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Shaw,* 973 F.Supp. at 552 (internal quotations omitted); *see also Bonfield v. AAMCO Transmissions, Inc.,* 708 F.Supp. 867, 875 (N.D.Ill.1989) (particularity requirements less strictly applied with respect to claims of fraud by omission).

The requirement that fraud be pled with specificity must be interpreted in light of Rule 8(a) requiring only notice pleading. "In balancing these two policies, 'the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare an adverse pleading.'" *Windsor Assoc., Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (D.Md. 1983), *quoting* Charles Wright and Arthur R. Miller, Federal Practice And Procedure, § 1297, at 415 (1969). Given the thoroughness of SCAA's complaint and the fact that SCAA did plead several instances of alleged fraudulent behavior with specificity, SCAA gives PMEI adequate notice of the basis of its fraud and negligent misrepresentation claims. Accordingly, the motion to dismiss will be denied as to Counts II and VIII.

### C. Other tort claims (Counts I, VI, VII, and X)

#### 1. Misappropriation of Valuable Confidential Information (Count I)

PMEI argues that, in light of SCAA's allegation that SCAA disclosed confidential information to PMEI in the course of the consulting relationship between the parties, SCAA cannot allege that the confidential information in question was unlawfully obtained. PMEI also contends that information about SCAA's version of VDL Mode 4 technology cannot be a "trade secret" for the purpose of a misappropriation claim because (1) SCAA does not own the patent on VDL Mode 4 technology, Paper no. 9, at 9, (2) because of SCAA's assertions that VDL Mode 4 technology has been installed on a trial basis in a number of aircraft, Complaint, at ¶ 12, (3) that ICAO will publish the international standard for VDL Mode 4 technology in November 2001[3], Complaint, at ¶ 13, and (4) that the ICAO process required disclosure of "underlying methods, techniques and devices that comprised the VDL Mode 4 technology", Complaint, at ¶ 61. PMEI's arguments first challenge the classification of the confidential information in question as a "trade secret" and second contend that SCAA cannot state a claim for misappropriation where it does not allege that PMEI obtained the information unlawfully.

 Under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md.Code. Ann., Commercial Law, § 11–1201(c) (1989), "in order to qualify as misappropriation . . ., one must either acquire the trade secret by improper means or disclose the trade secret without express or implied consent." "Trade secret" is defined in MUTSA as:

... information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

---

**3.** None of the papers state whether these standards were published as planned.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Code Ann., Comm. Law § 11–1201(e) (1989). The existence of a patent for the underlying technology is irrelevant to the question of misappropriation here because secret formulae and processes are themselves protected property rights, even if not patented. *Colgate–Palmolive Co. v. Carter Prods., Inc.*, 230 F.2d 855, 865 (4th Cir.1956); *See also Bond v. PolyCycle, Inc.*, 127 Md.App. 365, 375–376, 732 A.2d 970 (1999), *citing Head Ski Co. v. Kam Ski Co.*, 158 F.Supp. 919 (D.Md.1958)(even if all components available on the open market, the process, methods and materials used in combination may be a trade secret). A trade secret does not need to be a patent, but can be information of any sort, "like a secret machine, process, formula, or it may be industrial know-how...." *Space Aero Prods. Co. v. R.E. Darling Co.*, 238 Md. 93, 105, 208 A.2d 699 (1965); *see also Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 782, 591 A.2d 578 (1991) (trade secret is any formula, pattern, device or compilation of information that gives holder a business advantage). Similarly, demonstrations of the technology do not render information concerning the technology's development not confidential, even if the end result is public. *See Ellicott Mach. Corp. v. Wiley Mfg. Co.*, 297 F.Supp. 1044, 1053 (D.Md.1969) (drawings of final product released to public did not render meaningless the disclosure of confidential information where engineering information had not been disclosed).

█ SCAA alleges that it developed a process for using the VDL Mode 4 technology for which it sought PMEI's help in gaining international standardization. SCAA does not claim that the patented technology was misappropriated, but rather that PMEI misappropriated the methods and techniques created by SCAA for using the patented technology. Complaint, at ¶ 61. SCAA alleges that VDL Mode 4 technology is an important new development, that it sought to make its version the standard version, and that it paid over $2 million dollars to PMEI to help standardize it. Therefore, the information clearly has economic value to SCAA. In addition, while SCAA demonstrated its use of the technology, it does not allege that it revealed the underlying technical details. Finally, SCAA alleges that in dealing with PMEI, it sought to bind PMEI to a contractual agreement of confidentiality. Accordingly, SCAA alleges that all of the requirements of § 11–1201(e) are met and information regarding its version of the technology is a trade secret for the purposes of MUTSA.

PMEI's argument that SCAA cannot press a claim for misappropriation where it does not allege that the information was obtained unlawfully is based on *Diamond*, 852 F.Supp. at 412 n. 193, in which the court, on summary judgment, found as a matter of law that it was not misappropriation where, "T. Rowe Price allowed [the defendant] to work at home, regularly sent documents to her home, and cannot now complain that her possession of these documents violates MUTSA." However, in *Diamond*, the plaintiff proffered no evidence that Diamond improperly acquired the files or disclosed their contents to others. *Id.* Unlike in *Diamond*, SCAA paints its claim as one based not on the illegal obtaining of the information, but instead on the unauthorized use of the information gained in confidence. Paper no. 10, at 38–39. Under MUTSA, the unauthorized use of a trade secret is actionable. Md.Code. Ann., Commercial Law, § 11–1201(c). While Count I alleges that PMEI unlawfully obtained the information it used to its own advantage rather than on unauthorized use, the gravamen of SCAA's complaint is that PMEI gained access to the confidential information under false or

misleading premises and then misused it. On a motion to dismiss, the burden is on PMEI to demonstrate that SCAA does not plead facts sufficient to state a claim. The court will only grant the motion if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz*, 534 U.S. at ——, 122 S.Ct. 992, *quoting Hishon*, 467 U.S. at 73, 104 S.Ct. 2229. SCAA does plead facts legally sufficient to state a claim for Misappropriation.[4] Accordingly, the motion to dismiss will be denied as to Count I.

*2. Breach of fiduciary duty (Count VI)*

 PMEI asserts that Maryland does not recognize breach of fiduciary duty as an individual tort. In *Kerby v. Mortgage Funding Corp.*, 992 F.Supp. 787 (D.Md. 1998), the court dismissed a claim for breach of fiduciary duty because, "Maryland recognizes no 'universal or omnibus tort for the redress of breach of fiduciary duty,' at least in a situation where other remedies exist." *Id.*, 992 F.Supp. at 803, *quoting Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509 (1997). SCAA cites *Hartlove v. Maryland School For the Blind*, 111 Md.App. 310, 681 A.2d 584 (1996), *vacated and remanded for reconsideration*, 344 Md. 720, 690 A.2d 526 (1977), to support its assertion that Maryland law does recognize the independent tort of breach of fiduciary duty. Not only was *Hartlove* called into question by later precedent, it was explicitly repudiated in *Kann*, 344 Md. at 713, 690 A.2d 509 (*Hartlove* disapproved to the extent inconsistent with views expressed in that opinion) and *Bresnahan v. Bresnahan*, 115 Md.App. 226, 693 A.2d 1 (1997), which held, "[i]n light of *Kann*, it is doubtful that *Hartlove*'s creation of an

independent tort of breach of fiduciary tort has survived." *Id.*, 115 Md.App. at 235, 693 A.2d 1. SCAA maintains that the Maryland cases leave the door open a crack by suggesting that there are certain circumstances in which the court might recognize a tort for breach of fiduciary duty and cites *Bresnahan*, 115 Md.App. at 234, 693 A.2d 1, *quoting Kann*, 344 Md. at 713, 690 A.2d 509, in which the court stated that, " '[o]ur holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion.' " However, a careful reading of *Bresnahan* (quoting *Kann* ) merely leads to the conclusion that a breach of fiduciary duty would continue to be part of other causes of action. Accordingly, there is no independent tort for breach of fiduciary duty in Maryland, especially in light of the multiple alternative remedies involving the alleged breach available to SCAA, and so the motion to dismiss will be granted as to Count VI.

*3. Breach of duty of confidential relationship claim (Count VII) not preempted by MUTSA*

 PMEI argues that MUTSA preempts SCAA's claim for breach of duty of confidential relationship because it is based on misappropriation.[5] SCAA counters that its claim is based on principles of agency law and not misappropriation and so is not preempted by MUTSA. MUTSA, § 11–1207 states, in pertinent part:

(a) In General.—Except as provided in subsection (b) of this section, this subtitle displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret.

---

4. If SCAA means to press a claim for misuse and disclosure of confidential information as opposed to challenging the obtaining of the information as illegal, it would be prudent for it to amend its complaint.

5. PMEI's argument for the dismissal of Count VI on the same ground is moot given the dismissal of that count above.

(B) Exceptions.—This subtitle does not affect...

(ii) Other civil remedies that are not based upon misappropriation of a trade secret...

The dispute between the parties, then, is over whether SCAA's claim is "based upon misappropriation of a trade secret." The only Maryland case interpreting MUTSA preemption is *Bond v. PolyCycle, Inc.*, 127 Md.App. 365, 732 A.2d 970 (1999). In that case, the court held that "a claim for usurpation of a corporate opportunity, if based solely on misappropriation of a trade secret, cannot survive once a remedy under the MUTSA is obtained." *Id.*, 127 Md. App. at 377, 732 A.2d 970, *citing* MUTSA, § 11–1207(a)–(b)(1)(ii). In this context of this count, SCAA has not claimed that the confidential information appropriated by PMEI in allegedly breaching its confidential relationship with SCAA was a trade secret. Paper no. 10, at 39 n. 18. Not all confidential information is a trade secret, but must meet the definition in MUTSA of a "trade secret." *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 609 (D.Md. 2002). PMEI asserts that SCAA should be held to its characterization in Count I of the confidential information allegedly appropriated by it as a trade secret. Paper no. 11, at 24. However, as shown above, SCAA may plead in the alternative under the liberal federal pleading standards. Accordingly, SCAA's claim for breach of duty of confidential relationship is not preempted by MUTSA and so the motion to dismiss will be denied as to Count VII.

4. *Malpractice and Violation of the Professional Standard of Care (Count X)*

█ PMEI argues that Maryland does not recognize a malpractice claim against a consultant because consultants do not meet the statutory definition of a "licensed professional." Under Md.Code Ann., Courts and Judicial Proceedings, § 3–2C–01(b) (1998), a "claim" for malpractice, "means a civil action... originally filed in circuit court against a licensed professional that is based on the licensed professional's alleged negligent act or omission in rendering professional services, within the scope of the professional's license, permit, or certificate, for others." SCAA argues correctly that CJ § 3–2C–01 only applies to a claim against licensed professional. *See Adams v. NVR Homes, Inc.*, 135 F.Supp.2d 675, 716 (D.Md.2001) (suit does not constitute a claim under the statute where defendant is not a licensed professional). In addition, CJ § 3–2C–01 does not apply because, by its own language, the claim must be originally filed in Maryland circuit court. SCAA's claim was originally filed in this court. Finally, PMEI itself argues that it is not within the statutory definitions. For all these reasons, CJ § 3–2C–01 does not apply.

CJ § 3–2C–01 is not the sole cause of action for professional malpractice in Maryland. Rather, the statute, effective for claims filed only after October, 1998, provides extra protection from suit for a licensed professional by instituting a certificate requirement for bringing a claim. See CJ § 3–2C–02 (requiring the submission of a certificate of a qualified expert attesting that defendant "failed to meet the applicable standard of professional care" before a malpractice suit may be brought against a licensed professional). Nothing in CJ § 3–2C–01's own terms indicates it is meant to replace common law malpractice claims against non-licensed professionals. Further, in *Adams*, 135 F.Supp.2d at 716, when the court found that the statutory definition was not met, it refused to grant summary judgment and so the malpractice claims survived. Therefore, the appropriate analysis is whether SCAA states a common law claim for professional malpractice.

In *Shofer v. Stuart Hack Co.*, 124 Md.App. 516, 529, 723 A.2d 481 (1999), the court stated:

> Professional malpractice is one genre of negligence. Once it is established that defendant owed plaintiff a duty, plaintiff must prove that defendant, whether a physician, lawyer, architect, accountant, or pension administrator, breached the standard of care applicable to other like professionals similarly situated.

*(citing Reed v. Campagnolo*, 332 Md. 226, 232, 630 A.2d 1145 (1993) (plaintiff in malpractice case must show a lack of requisite skill or care on the part of professional that was a direct cause of injury)). Therefore, as with other negligence claims, SCAA must allege a duty of care, a breach of that duty, and damages as a proximate cause of the breach. *See Shofer*, 124 Md. App. at 529, 723 A.2d 481, *citing Flaherty v. Weinberg*, 303 Md. 116, 128, 492 A.2d 618 (1985) (legal malpractice). First, as demonstrated above, SCAA alleges that there existed a special relationship between the parties, beyond mere contract, giving rise to a duty of care. Specifically, SCAA alleges that PMEI was hired because it held itself out as having expertise in both the field of air traffic control and also in the ICAO standardization process. These allegations are sufficient to state that PMEI owed SCAA a duty to use the degree of care and skill of a reasonable professional in its field. Second, SCAA alleges that PMEI failed to use the requisite degree of care and skill by acting with a conflict of interest and failing to disclose that it was representing entities with interests adverse to SCAA. Finally, SCAA alleges that this breach of duty resulted in damages arising from a delay in the implementation of SCAA's version of VDL Mode 4 technology and from the marketing of an alternative form of the technology. Accordingly, SCAA states a claim under Maryland common law for professional malpractice and so the motion to dismiss will be denied as to Count X.

## IV. Conclusion

For the foregoing reasons, PMEI's motion to dismiss under Rule 12(b)(6) will be granted as to Count III (Breach of Duty of Good Faith and Fair Dealing), Count VI (Breach of Fiduciary Duty), and Count IX (Overt False Representation). It will be denied as to all other counts. A separate order will be entered.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of March, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendant's motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) BE, and the same hereby IS, GRANTED as to Counts III, VI, and IX;

2. Defendant's motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) BE, and the same hereby IS, DENIED as to Counts I, II, IV, V, VII, VIII, X, XI, XII, and XIII;

3. Counts III, VI, and IX BE, and the same hereby ARE, DISMISSED; and

4. The Clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties.